DEWAR et al. v. MOWINCKEL.

(Circuit Court of Appeals, Ninth Circuit. May 16, 1910.)

No. 1,816.

1. ADMIRALTY (§ 118*)—APPEAL—REVIEW OF FINDINGS.

The finding of a trial court made on conflicting evidence that a firm to whose agent the bill of lading of a cargo of coal was indorsed was the consignee, and bound by the terms of the bill of lading and charter party in respect to time for discharge, affirmed.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. § 770; Dec. Dig. § 118.*]

2. SHIPPING (§ 181*)—DEMURRAGE—ARRIVAL OF SHIP—FAILURE OF CONSIGNEE TO DESIGNATE PLACE FOR DISCHARGING.

Where the consignee of a ship's cargo is given the right by the charter party to designate the place of discharge at the port of delivery, either at a safe wharf or alongside, it is his duty to exercise such right within a reasonable time after notice of the arrival of the vessel at the port, and his failure to do so is a waiver of the right, and entitles the ship to consider her voyage at an end, and give notice of her readiness to discharge, which will start her lay days to running.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 589–592; Dec. Dig. § 181.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

3. SHIPPING (§ 173*)—CHARTER PARTY—CONSTRUCTION—CESSER CLAUSE.

The rule of construction of a charter party containing a cesser clause relieving the charterer from responsibility after the completion of loading and also providing that the charterer shall pay freight and demurrage for delay in discharging, and giving a lien therefor, is that the cesser clause is to be construed, if possible, as inapplicable to a liability with which the lien is not commensurable, and where a ship was required to deliver her cargo of coal to a purchaser, and discharge the same upon a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

general pile, by which the lien was lost, the charterer may be held liable for the freight and demurrage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 570; Dec. Dig. § 173.*]

**4. SHIPPING (§ 49*)—LIEN ON CARGO GIVEN BY CHARTER PARTY—ENFORCEMENT AGAINST INDORSEE OF BILL OF LADING.**

A shipowner's lien on cargo given by the charter party is not preserved against the indorsee of a bill of lading except so far as those terms of the charter party are expressly incorporated into it.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 198–200; Dec. Dig. § 49.*]

**5. SHIPPING (§ 183*)—DEMURRAGE—MEASURE OF DAMAGES.**

A rate of demurrage agreed upon in a charter party for a certain number of demurrage days will be adopted by the court as the measure of damages for further detention of the ship in the absence of other evidence, but it is open to either party to show that it is not the true measure.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 593; Dec. Dig. § 183.*]

Appeal from the District Court of the United States for the Northern District of California.

Suit in admiralty by J. Ludwig Mowinckel, as owner of the steamer Rygja, against James Dewar, John McLaren, Ernest Gripper, and William Webb, partners as Dewar & Webb, the Lithgow Coal Association, Evan C. Evans, garnishee, and Joseph L. Schmidt and James B. Smith, sureties. Decree for libelant (173 Fed. 544), and respondents appeal. Modified and affirmed.

On November 30, 1907, the Norwegian steamer Rygja was chartered by the appellee to the Lithgow Coal Association, a corporation of New South Wales, for the carriage of a cargo of coals from Sydney to San Francisco. The charter provided in clause 4 that the vessel with her cargo "shall therewith proceed to San Francisco (California) and deliver the said full and complete cargo in the usual and customary manner, at any safe wharf or place, or into craft alongside at San Francisco or other safe place within the Golden Gate, always afloat, as ordered by consignees. * * * (12) The cargo to be taken delivery of from alongside ship at the average rate of not less than 600 tons per working day (Sundays and legal holidays excepted), from the time the ship is in berth and ready to discharge, and 24 hours notice thereof has been given by the master in writing, with 12 days allowed on demurrage (4) at the rate of four pence per register ton per day." When the steamer was loaded, the bill of lading was issued to the charterer, requiring delivery of the cargo to order or assigns, and the captain of the steamer bore with him a sealed packet, the contents of which were unknown to him; containing the charterer's copy of the bill of lading indorsed to Evan C. Evans, the agent at San Francisco of Dewar & Webb of London. On arriving at San Francisco, the Rygja was entered at the customhouse on February 4, 1908. Having learned from a San Francisco shipping journal that his vessel was consigned to Evan C. Evans, Capt. Svendsen, the master, gave notice to Evans that the steamer had arrived and had entered at the customhouse, and was ready for discharge at 3 p. m. on February 4, 1908. On the following day Evans replied, advising the captain that the receivers of his cargo were the Western Fuel Company "who have a copy of the charter party, and from whom you will please take your orders under clause 4 of your charter party." He later further advised the captain that the agent for the charterer was John Barneson of Barneson & Hibbard, East street, San Francisco. Immediately after the receipt of Evans' letter, the master of the Rygja had a conversation with him, in which the latter said that he had nothing to do with the cargo, that

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Barneson represented the charterer, and that the cargo was for the Western Fuel Company. Evans gave the captain a letter to the Western Fuel Company, on the presentation of which to that company the captain was informed that there was no berth to be had "for quite awhile," and that he would be informed when he could get a berth. The captain then went to Barneson, and the latter confirmed the statement of Evans, and said that he could give no information as to the time when a berth could be had, but that he would do his best to obtain one as soon as possible. In a conversation with Evans on February 5th, the captain was informed by Evans "that it was a very complicated affair," and, when he was asked to give the captain an acknowledgment of the receipt of his notice, Evans answered that he could not do it at the time. In order to clear up the situation, and ascertain who was his consignee, the captain had a second conversation with Evans on the afternoon of February 5th, and asked him for money on account of freight. Evans informed him that he had better see Barneson again about it. On the morning of the 6th the captain called on Barneson, and asked for money on account of freight. Barneson answered that he could not do any such thing, and advised the captain to go to Evans, where he would get his money. The captain again saw Evans, and, with a view to ascertaining whether or not he was the consignee, asked him again for money on account of freight. Evans refused to pay money on account of freight, and suggested to the captain that he seek legal advice. On the 7th the captain secured from Barneson an acknowledgment that he had received the notice of the arrival of the vessel, and of her readiness to discharge, with the further statement therein: "Will notify you as soon as a berth can be obtained for discharging." On February 7th, under advice of his attorneys, the captain sent to the Western Fuel Company, Evans, and Barneson each a notice detailing the facts above set forth, and demanding that they severally and jointly, as representing the charterers of the Rygja, exercise the option given by the charter party, and designate a place for discharge as therein provided, and notified them that the owner would hold the proper parties responsible for demurrage and damage for any detention of the Rygja beyond the terms of the charter party, and for any damage resulting from their failure to designate a safe place for the cargo's delivery under the terms of said charter party. On February 8th Evans wrote the captain, saying: "So far as I am concerned, I have only to refer you to your charter party and to my letter of the 5th inst., instructing you where your steamer would discharge. If you did not ascertain from the Western Fuel Company when you first called on them the particular wharf of theirs that your steamer is to proceed to, I would suggest that you again call on the company and get this information." Barneson answered, directing the captain's attention to the notice given him by Mr. Evans referring him to the Western Fuel Company for his instructions, as to berth, "which notice we confirm and repeat." The Western Fuel Company answered: "We are to take delivery of the cargo of coal aboard your vessel as per terms of your charter party." These answers leaving the captain in doubt and uncertainty, he cabled the charterer at Sydney: "Arrived here February 4th. Telegraph name of consignees, also who pays freight. Evans representing Dewar & Webb and Captain Barneson do not admit any responsibility." No answer was received to this request for information. On February 11th the captain's attorneys wrote to the Western Fuel Company, referring to the fact of the detention of the vessel since February 4th, and to the fact that Evans had informed the captain that the Western Fuel Company were the receivers of the cargo, and had a copy of the charter party, that he was to take his orders from the company, and concluded: "As the captain of the Rygja has had contradictory information on the subject, we should be obliged if you will affirm or disaffirm the statement that, under clause 4 of the charter party, he is to take his orders from you as the consignees of the cargo. If you affirm this, you will please advise us when you became the holders of the bill of lading covering this cargo, and also whether the Rygja is to look to you for the payment of her freight and demurrage." There was no written answer to the letter, but the company informed the captain by telephone that it was not the consignee of the cargo, or the holder of the bill of lading covering the same, and that the vessel was not to look to the company for her freight. On

February 18th the captain's attorneys wrote to Barneson, informing him of the master's dilemma, and asking his help in the solution of it. Barneson answered on February 15th that he had no authority to represent the charterer. On February 18th Evans wrote the captain that he had just received a cable message from Dewar & Webb, instructing him to pay freight as per charter party "for our account," and stating that he was prepared to pay freight as per charter party. On February 26th Evans wrote the captain, saying: "I am instructed by the Western Fuel Company to instruct you to take the Gymeric's berth as soon as she has finished discharge. You will therefore please be careful to see that you follow the S. S. Gymeric, and as soon as you are in berth and ready to discharge give me and/or the Western Fuel Company notice thereof." At that time the Gymeric was lying in the stream, but on March 4th she was docked at the Mission street wharf, No. 2, and on March 12th she finished discharging cargo. On that day the captain wrote Evans that, if he discharged as ordered, he would be unable to retain possession of the cargo, and would thereby lose his lien, and requested that some arrangement be made to protect his lien. He also asked to be allowed to see the bill of lading of the cargo, so that he might know to whom to make delivery. In answer to that letter Evans referred him to the terms of the charter party, and informed him that the bill of lading had been lodged with the custom authorities. Following up this information, the captain found from an inspection of the charterer's copy that it had been first endorsed by the charterer to Evans, that Evans had then indorsed it to Barneson, and that Barneson had, in turn, indorsed it back to Evans, and the captain also discovered that on March 12th Evans had entered the cargo as consignee and had turned over to the collector of the port under oath the bill of lading covering the same. On the morning of March 13th, the steamer proceeded to the designated wharf, where she finished discharging on March 22d, receiving her freight money daily from Evans. In his libel to recover demurrarge for his detention of 39 days, the appellee, in addition to the other facts therein set forth, alleged upon information and belief that at the time of the arrival of his vessel at the port of San Francisco a contract was then in existence between either Evans as the representative of Dewar & Webb, or the charterer and the Western Fuel Company, for the sale to the latter of the cargo after its delivery at said port, and that the detention of the steamship and the failure of the master to find a consignee of the cargo arose through a desire on the part of the libelees, as charterers and consignees, to avoid responsibility for demurrage. In the original answer of both the charterer and Dewar & Webb to the libel, it is distinctly alleged that the Western Fuel Company was the consignee of the cargo, and that the master of the steamship was so informed on February 5th, but that "he refused to recognize his said consignee." The answer also denied that the cargo was under an agreement for sale after its delivery at the port of San Francisco, and alleged that it had been sold while en route to the Western Fuel Company. On the trial, however, Dewar & Webb amended their answer, and alleged that the charterer was the consignee, and that they were the purchasers from the charterer of the cargo, to be delivered by the charterer to Evans "landed on the wharf at San Francisco, duty paid." They also changed their answer by omitting the denial that the cargo was under an agreement for sale after its delivery to an admission of that fact. The trial court found from the evidence that the charterer delivered the cargo on board at Sydney for carriage to the port of San Francisco; that a bill of lading was issued to the charterer; that Dewar & Webb thereafter purchased the cargo to be delivered at San Francisco, and thereupon, as part of the transaction, the charterer indorsed the bill of lading to Evans; that the purpose of the indorsement was to enable Evans to enter the cargo at the customhouse, and to make sale and delivery thereof at San Francisco for his principals Dewar & Webb; that, while the cargo was afloat, Evans sold the same to the Western Fuel Company, that company to take delivery thereof upon the wharf at San Francisco, the contract also giving the vendee the right to designate the wharf to which delivery should be made; that at the date of the arrival of the steamship at San Francisco there was a controversy between the Western Fuel Company and the representative of the charterer and Dewar & Webb growing out of the refusal of the Western

Fuel Company to receive the cargo, unless the vendors would undertake to secure it against any damage which it might sustain in the event that the cargo contained an excess of twenty per cent. of screenings; that this controversy was not adjusted until February 8, 1908, at which time the Western Fuel Company finally accepted delivery of the cargo under an agreement then made; that the bill of lading incorporated the terms and stipulations of the charter above set out, and that, although Evans, as indorsee of the bill of lading, held the legal title to the cargo until it was delivered to the Western Fuel Company, still he held it as the agent of Dewar & Webb, and that firm was in fact the consignee of the cargo, and as such bound by the stipulations contained in the bill of lading.

The conclusion reached by the District Court was that Dewar & Webb were the consignees of the cargo, and bound by the terms of the charter party and bill of lading; that, although under the charter party the consignee was given an option to designate the precise place of discharge, and although, if the option had been exercised, the lay days of the ship would not have commenced to run until she had reached that place, still, the option not having been exercised within a reasonable time, the right to exercise it was waived, and consequently the steamship, being at the time her notice was given, at one of the alternate places of discharge named in the charter party, was an arrived ship; that a reasonable time within which to exercise the option of naming a precise place for discharging the cargo expired on February 6th, so that the vessel was to be regarded as an arrived ship on February 7th, and notice of her readiness to discharge was properly given on that day; that her lay days commenced on February 10th, 24 hours after the notice, and excluding Sunday, February 9th, and that, therefore, the appellee was entitled to 12 days' strict demurrage at four pence per register ton per day, and damages in the nature of demurrage for each day's subsequent delay, and the court held that such damages should be prima facie calculated on the basis of the strict demurrage rate, but that it was open to either party to show that the true measure of loss to the shipowner was less, for which purpose the case was referred to a commissioner. The commissioner, upon the evidence, found that the appellants had failed to prove that the rate of four pence per register ton did not express the true measure of damage, but upon the testimony of one of the appellee's witnesses, he found that the true measure of damages for the delay for the 20 days following the 12 strict demurrage days was £30 a day. His report was approved by the court.

Nathan H. Frank, for appellants.

E. B. McClanahan and S. H. Derby, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). The District Court found that Dewar & Webb were the consignees. Aside from the presumption which attends such a finding of fact on conflicting testimony, it is to be observed that the finding is well supported by the evidence. In answering the libel Dewar & Webb alleged that the Western Fuel Company was the consignee. On the trial it amended its answer, and alleged that the charterer was the consignee. It was not denied that the bill of lading came indorsed by the charterer "Deliver to the order of Evan C. Evans," that Evans indorsed it to the order of Barneson as agent of the charterer, and that it was subsequently reindorsed to Evans. Evans attempted to explain the transaction by saying that the cargo was purchased for the charterer "delivered on the wharf here, duty paid," and that he indorsed the bill of lading over to Barneson as agent of the charterer, in order that he might tender the cargo in accordance with the terms of the contract; that, desiring Evans to finance the cargo for the charterer,

Barneson reindorsed the bill of lading to Evans, but that the charterer remained the owner of the cargo until it was landed on the wharf, or, in other words, the bill of lading was indorsed to Evans, and he refused to accept it when he found that the terms of the contract were that the coal was sold, delivered on the wharf, and that he afterwards entered the cargo for the charterer at the customhouse at the suggestion of Barneson as agent of the charterer. This was on March 12th, and, although the affidavit filed in the customhouse declared on oath that Evans was the consignee, he testified that he made it as agent for the charterer, but was not allowed so to express that fact in his affidavit, and he testified that Barneson had appointed him agent of the charterer to enter the cargo, and had directed him to enter the cargo and to pay freight and duty, and take the costs of the same out of the money to be collected eventually from the Western Fuel Company. There was no corroboration of Evans' testimony in these particulars. On the contrary, it is inconsistent with Barneson's letter of February 15th, in which the latter stated that he had no authority to represent the charterer in the matter of the cargo of the Rygja. Barneson was not called as a witness to corroborate any of Evans' statements. It is to be observed also that in his letter of February 18th to Capt. Svendsen Evans stated that Dewar & Webb, his principals, had instructed him to pay the freight "for their account." In view of the undisputed facts, as shown by the correspondence and papers, it is not surprising that the trial court failed to credit the statements of Evans. He, as the agent of Dewar & Webb, was the indorsee and holder of the bill of lading. He filed the bill of lading in the customhouse, paid the custom duties, and required the captain of the steamship to give him notice of his readiness to discharge. He made the payments of freight as the discharge progressed, and he received the master's receipts of payments on account of freight. His letters to the master were signed as agent for Dewar & Webb, and the captain's letter of March 13th, on ascertaining who his consignees were, is addressed to Evans as representing the consignees of the cargo, and Evans made the affidavit to Dewar & Webb's first answer to the libel, in which it was stated that the Western Fuel Company was the consignee.

It is contended that the District Court erred in holding that, under the charter party, notice assigning the ship to a berth must be given within a reasonable time, and it is said that it is immaterial when the notice is given so long as the ship receives the first available berth. The rule that the consignee's option must be exercised within a reasonable time is supported by Carver on Carriage by Sea (5th Ed.) 625b, and Scrutton on Charter Parties (5th Ed.) 99. In Tharsis Sulphur & Copper Co. v. Morel, 7 Asp. Mar. Cases (N. S.) 106, Bowen, L. J., said, "The option was given for the benefit of the charterers, and must be exercised within a reasonable time"; and in Carlton S. S. Co. v. Castle Mail Co., 8 Asp. Mar. Cas. (N. S.) 325, Lord Esher said that, upon the arrival of the ship in port, "the charterers became entitled to give the order as to the berth into which the ship should go, and the owners were entitled to receive the order from the charterers. The charterers had no right to wait for a month before giving the order. They were bound to give it almost immediately." The appellants

quote the language of Lord Herschel on the appeal of Carlton S. S. Co. v. Castle Mail Co., to the House of Lords (App. Cas. 1898, 492), in which he said that the obligation of the charterers to name a berth as soon as the vessel arrived was not to be found in the charter party. "It is not there in terms—there is no provision to that effect. If it exists, it must be only because that is the reasonable inference to draw as to the intention of the parties from the construction of the whole of the contract. It seems to me impossible to find properly by implication in this contract any such condition. * * * If, when the ship arrives, they delay naming a berth, but yet load within a reasonable time, they are not liable. The obligation is to load within a reasonable time." But the remarks of Lord Herschel must be measured by the facts of that case, facts materially different from those of the case at bar, and his remarks were not concurred in by Lord Watson, Lord Macnaughton, or Lord Shand. From their opinions it would seem that the views of the lower court as to the point under discussion were approved. In The St. Bernard (D. C.) 105 Fed. 994, Judge Brown held that a designation by a charterer of a berth on notice of the vessel's arrival in port was given within a reasonable time when delivered within two or three hours after such notice. Every suggestion of equity as well as the exigencies of carriage by sea tend to support the rule that such an option must be exercised promptly on the arrival of the ship, and that then the shipowner is entitled to be informed to what berth his ship is to be assigned. If he consents to give the consignee the option to name a place of discharge, he should have the right to demand that the option be exercised within a reasonable time. He does not contract that his ship shall lie in the harbor as a storehouse of cargo. The facts in the present case serve to emphasize the reasonableness of the rule. The captain spent a number of days in a blind search to find his consignee. On February 5th he was directed by Evans to take his orders from the Western Fuel Company, who, Evans said, were the receivers of the cargo. But that direction to take orders was not an exercise of the option. When the master did as he was told, he found that the Western Fuel Company denied its obligation to receive the cargo. He then applied to Barneson, who, as Evans said, represented the charterer. Barneson could give him no information about a berth. He did not then deny that he had authority to act, but he subsequently denied it. On February 10th, the Western Fuel Company wrote the captain: "We are to take delivery of the cargo of coal aboard your vessel as per terms of the charter party." But this was no designation of a place of discharge, and on the following day the manager of the fuel company denied that his company was the consignee or the holder of the bill of lading, or that it was responsible for the freight. There was no exercise of the option until February 26th when Evans, "representing Dewar & Webb of London," instructed Capt. Svendsen to take the Gymeric's berth "as soon as she has finished discharge," and named the berth which the Gymeric was to take. It is no answer to these considerations to say that, if the Rygja had upon her arrival been ordered to the bunkers of the Western Fuel Company, she could not have discharged her cargo at any earlier date than she did. Those bunkers were not the only

places for discharge to which she might have been assigned. The court below well said that if the consignee could delay naming one of those bunkers as the place of discharge from the 4th to the 26th of February, and still retain the option given by the charterer, "it would have had the right at the latter date to direct the vessel to proceed to one of the many other places referred to in the charter and discharge, if for any reason it had been to the interest of the consignee to so order." We find no error in the conclusion of that court that the failure to exercise the option within a reasonable time was a waiver of the right to exercise it at all, and that, where a contract provides alternative modes of performance and gives the right of election to one party, upon the failure of such party to make his election at the proper time the right to elect the mode of performance passes to the other party. It follows that, if the right to exercise the option was waived, the Rygja became an arrived ship as soon as she reached one of the alternative places named for her discharge, and she was ready to discharge, and that her lay days began to run 24 hours after she had given notice of that fact, and that her delay was chargeable to the consignee of her cargo.

The appellants contend that the charterer was released from its liability for demurrage and damages by the cesser clause of the charter party, which provides: "Charterer's liability under this charter party to cease on completion of loading, owners having a lien on the cargo for freight and demurrage"; and it is said that there is no evidence to justify the claim that the lien so conferred was not capable of enforcement. The rule of construction of a charter party which provides that the charterer's responsibility shall cease on completion of the loading, and also provides that the charterer shall pay freight and demurrage for delay and creates a lien on the cargo for freight and demurrage, is that the cesser clause is to be construed, if possible, as inapplicable to a liability with which the lien is not commensurate. Crossman v. Burrill, 179 U. S. 100, 21 Sup. Ct. 38, 45 L. Ed. 106, and cases there cited. The court below evidently found the lien not commensurate with the liability, and in so finding there was no error. The charter party required a discharge of the cargo at a place to be ordered by the consignee, and freight was only to be paid on final discharge. The master requested of Evans that the discharge be made in such a way as to protect his lien, but his request was not complied with. The master testified that he was required to discharge into a general coal pile. Evans, it is true, testified that a portion of the coal was taken up into the bunkers, and thence shot into the Beacon Rock, and that the Beacon Rock then went over to Sausalito, but the manager of the fuel company testified that the coal went into hulks mostly, and that only 2,626 tons of the cargo went into the Beacon Rock. In any view of the evidence, the cargo passed out of the possession of the master, and went into the possession of a third party, the Western Fuel Company. The lien for demurrage, like the lien for freight, is lost when the cargo is delivered to the consignee. "The lien of a shipowner for freight being but a right to retain the goods until the payment of freight, it is inseparably associated with the possession of the goods and is lost by an unconditional delivery to

the consignee." Chief Justice Taney in Bags of Linseed, 1 Black, 108, 17 L. Ed. 35. Another ground for holding that the cesser clause is not applicable here is that the clause was not inserted in the bill of lading and the bill of lading was in the hands of a stranger to the charter party. The shipowner's liens on cargo given by the charter party are not preserved against the endorsee of a bill of lading except so far as those terms of the charter party are expressly incorporated in it. Carver on Carriage by Sea (5th Ed.) § 160; Scrutton on Charter Parties (5th Ed.) p. 50. The cesser clause is not imported into the bill of lading in this instance by the use of the words "all of the terms and exceptions contained in which charter are herewith incorporated," for such words include only the conditions of the charter party which are to be performed by the holder of the bill of lading, such as the payment of demurrage and freight and the mode of delivery to him by the shipowner. Carver, § 160.

We find no ground for disturbing the award made by the trial court for demurrage and damages chargeable against the appellants. The parties to the charter party agreed upon four pence per register ton per day for detention during the stipulated demurrage days. Ordinarily the rate of damages so agreed upon will be adopted by the court for further detention, but either party may show that it is not the true measure of the loss to the shipowner, and the rate may be adjusted accordingly. Carver's Carriage by Sea, § 609; Randall v. Sprague, 74 Fed. 247, 21 C. C. A. 334. No effort was made by the appellants to adduce evidence before the commissioner, to whom the question of damages was referred, to show that the agreed rate of four pence per ton did not express the true measure of damages. There was evidence, however, proffered by the appellee to the effect that £30 per day was a fair and reasonable rate for damages under the circumstances of the case, and he found that that sum was manifestly the loss to the owner through the detention of the ship for the 20 days following the stipulated demurrage days. The appellee contends that the damages for the delay for the whole period should be fixed at the stipulated rate of four pence per day per register ton, but, in view of the evidence, we are not convinced that there was error in the finding of the commissioner or in the affirmance of the same by the court.

Having found that the lay days of the Rygja commenced to run on February 5th, instead of February 10th, the decree of the District Court is modified, by increasing the amount awarded thereby to $6,-136.32, and, as so modified, will stand affirmed.