HAHLO et al. v. BENEDICT.

BENEDICT v. HAHLO et al.

(Circuit Court of Appeals, Second Circuit. June 11, 1914.)

No. 289.

1. SHIPPING (§ 54*)—CHARTER—LIABILITY FOR INJURY TO VESSEL.

Although a charter party in terms requires the charterer to redeliver the vessel in as good condition as when received, the courts will imply a condition which will relieve him from noncompliance if the reason therefor is the fault of the owner's servant.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

2. SHIPPING (§ 39*)—CHARTER—LIABILITY FOR INJURY TO VESSEL.

A provision of a charter party that "the captain shall pay the charterer the same attention as if he were the owner and take the yacht where ordered by the charterer * * *" gives the charterer full control over the navigation of the vessel, and makes the captain his agent, regardless of who hired him.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

3. SHIPPING (§ 54*)—CHARTER—LIABILITY FOR STRANDING OF VESSEL.

The stranding of a yacht on a known shore in the daytime and in open weather *held* due to the fault of the master, who under the charter was the servant of the charterer and not of the owner.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

4. SHIPPING (§ 194*)—GENERAL AVERAGE—SUBJECTS OF COMPENSATION.

Expense incurred by a yacht for wages and supplies while going to and from a port of refuge, which she was compelled to make because of stranding, constitutes a proper general average charge, but must be separated from other expenses of the voyage.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 613–617; Dec. Dig. § 194.*

General average, see notes to Pacific Mail S. S. Co. v. New York, N. & R. Mining Co., 20 C. C. A. 357; The Santa Ana, 84 C. C. A. 316; British & Foreign Marine Ins. Co., Ltd., v. Maldonado & Co., Inc., 106 C. C. A. 133.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. SHIPPING (§ 58*)—CHARTER—LIABILITY OF CHARTERER FOR INJURY TO VESSEL—DAMAGES.

Under a charter by which the charterer became liable for any loss or injury to the vessel not recoverable under a policy of insurance held by the owner, where the vessel was stranded through fault of the charterer's servants, he was entitled to set-off against his liability items of expenditure which could have been brought into general average and proved under the policy, and of which the owner was given timely notice.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 233–244, 314, 327; Dec. Dig. § 58.*]

6. SHIPPING (§ 40*)—TIME CHARTER—DEMURRAGE FOR DELAY IN REDELIVERY.

Under a time charter of a yacht, a provision that in case of failure to redeliver at the expiration of the charter period the charterer should pay demurrage is valid and enforceable.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 40.*

Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Arthur H. Hahlo and another, executors, against E. C. Benedict, and cross-libel. Decree for libelants, and respondent appeals. Modified and affirmed.

Peter S. Carter, of New York City, for appellant.

J. P. Kirlin, of New York City, for appellees.

Before COXE and ROGERS, Circuit Judges and HAND, District Judge.

HAND, District Judge. The first question is of liability, Which party is responsible for the losses which arose from the stranding? This question is to be determined by the charter party itself. The stipulations of the respondent are contained in the sixth article:

"The charteree [charterer] agrees * * * to redeliver the yacht * * * on the expiration hereof at New York, N. Y. in as good condition as that in which he received her, reasonable wear and tear and such damage as he may not be liable to make good excepted * * * and should the charteree not then so redeliver the yacht he agrees to pay demurrage."

The seventh article is as follows:

"The charteree [charterer] agrees to pay for * * * any loss to the yacht or equipment * * * not covered or recoverable under the policy of insurance hereinafter provided for or which may have occurred from any cause other than one arising out of the breach of conditions set out in paragraph 1 of this agreement."

The ninth clause reads as follows:

"The captain shall pay the charteree [charterer] the same attention as if he were the owner and take the yacht where ordered by the charteree within the limits of navigation specified in the policy of insurance."

[1, 2] The obligation of the charterer under article sixth to redeliver the boat is without condition, and courts might have held that he undertook by the stipulation in question to redeliver the boat regardless of whose servant the captain might be. Sun P. & P. Co. v. Moore, 183

U. S. 642, 22 Sup. Ct. 240, 45 L. Ed. 366. However, it is recognized that it would be unreasonable to require absolute compliance by the charterer, if the reason for noncompliance was the fault of the owner's servant. Hence all the cases consider that question and have implied such condition into the agreement to redeliver. The ninth article certainly intends to substitute the charterer for the owner, during the term of the charter; that is to say, it subjects the captain to the same direction from the charterer as he would be bound to give the owner were it not for the charter. In the face of this provision it becomes of small consequence who originally engaged the captain, provided the stranding resulted from his fault. In Hills v. Leeds (D. C.) 149 Fed. 878, and The Del Norte, 119 Fed. 118, 55 C. C. A. 220, the offending servant had been in fact selected by the owner, but he was under the control of the charterer. In the Del Norte, the phrase was "under order and direction" of the charterer. In Hills v. Leeds, supra, the phrase was:

"The hirer is to have the same authority as the owner of the boat so far as regards the management of the yacht and the control of the captain and engineer, and that, in the event of either of them proving disobedient or incompetent, the hirer shall have the right to discharge him or them, and engage others in their place."

Although more expanded than the clauses of article ninth of this charter, the intent is the same as here. In The Barnstable, 181 U. S. 464, 21 Sup. Ct. 684, 45 L. Ed. 954, it is true that the charterers had appointed the crew, but the test was who had control during the charter. The same thing is true in Baumvoll v. Gilchrest, L. R. (1892) 1, Q. B. 253. There Lord Esher says, at page 259, that the question depends upon—

"whether the owner has by the charter, where there is a charter, parted with the whole possession and control of the ship, and to this extent that he has given to the charterer power and right independent of him and without reference to him to do what he pleases with regard to the captain, the crew, and the management and employment of the ship."

Mr. Justice Story, in Marcardier v. Insurance Co., 8 Cranch, 39, 49, 3 L. Ed. 481, puts the test in these words, "exclusive possession, command, and navigation." The same thing is repeated in Reed v. United States, 11 Wall. 591, 600, 20 L. Ed. 220. In Leary v. United States, 14 Wall. 607, 610, 20 L. Ed. 756, the phrase is, "entire command and possession of the vessel and the consequent control over her navigation." This test seems to be approved in United States v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403. We cannot doubt, therefore, that the master was the agent of the owner at this time, and we do not think it material who actually selected or employed him. That being true, there is no reason to except the charterer from the covenant of the sixth article.

[3] The next question is of the negligence of the master, because the sixth article of the charter exempts the charterer from any damage which he may not be liable for and the tenth article exempts him from his hire in case the yacht is incapacitated by damage or accident for which he is not responsible, and he would not be responsible if the

loss happened from inevitable accident or peril of the sea. It must be a very clear case which would hold it an inevitable accident for a vessel to run ashore on a known coast two hours after sunrise in open weather. It may seem now too simple to say that the cause was the yacht's running too near inshore, but that in fact is the whole story, and carries its own blame along with it. There was no necessity to bring her so near the reef, and there was all the more danger if a haze or smoke obscured the exact position of the land. The master does not pretend that the reef on which she stranded was unknown or even uncharted; it is true that the exact position of the rock that she struck was not charted, but everybody knew that the bottom off the Colorado Reef was not laid down with the exactitude of the East river. To bring her deliberately inshore under those circumstances was to take a chance of just what actually happened. Some question has been made of the easterly set of the tide on the Island of Cuba. This seems to be a possible explanation, but masters are responsible for known currents, and it is not suggested that there was anything unknown, or at least unknowable, about this particular current. If they navigate in waters which are not known, they should keep a leeway of safety. We do not understand that any one claims there was a greater easterly set that day than usual. It therefore appears that the charterer is liable under the stipulations contained in the sixth and seventh articles of the charter.

[4] The next question relates to damages. In making up the general average statement adjustment was made between what supplies were consumed at Havana, or on the way there, and the rest. These wages and supplies were treated as part of the salvage service, upon the theory that it was necessary to proceed to Havana as a port of refuge for inspection before the Virginia could safely go to New York. As such they fell within Risley v. Ins. Co. of N. A. (D. C.) 189 Fed. 529. However, only so much could be brought into general average as were properly apportionable to that portion of the voyage; the rest remained outside the insurance altogether. We do not understand that the charterer questions the propriety of the division between the period before and after the detention for inspection as made, or asserts that the items are incorrect, provided the expenses on the way to Havana, and while detained there, only could be included in general average. We think that under general average only so much can be included.

[5] On the other hand, we think that in spite of the negligence of the charterer's servants in stranding the yacht, he is entitled to set-off those items of his own expenditure which could have been brought into general average by the owner. The owner was advised of the claim in season, the charterer made claim of them against him. Since he held the policies pro tanto for the benefit of the charterer and was charged with a duty to act for him with reasonable assiduity, we believe that as soon as he learned of the claim he ought at least to have made inquiry as to their genuineness and provability under the policies, and that his disregard in that respect subjects him to a set-off equal in amount with what would have been allowed the charterer. The learned commissioner seemed to suppose that it makes a difference because the charterer has paid nothing to the owner, and that to set off these

claims would be to charge him because of the charterer's own default. We think that this misconceives the relations of the parties; the set-off is allowed because the owner owed a positive duty to the charterer to prove for him upon the policies, and while the losses did originate from Bond's negligence, that did not deprive the charterer of his right to be protected under the policies. The items to be included are the meat destroyed, $311.10, and wireless messages, $34.80. The lighthouse tender charge is found to be a gratuity. If the provisions claimed, $435.50 and $271.03, were not brought before the underwriters, the set-off will contain also an allowance made for them on the basis of the time consumed going to, and at, Havana, as a port of refuge. This adjustment can probably be made by consent, or may be brought before Judge Hand for disposition in case of a dispute.

[6] The next question is of the damages for failure to deliver until June 27, 1911. This is expressly covered by the sixth article of the charter party, and will control unless the court set it aside as a penalty. It is hardly useful to add at length to the extraordinary confusion upon this subject. Equity, wisely or not, has always relieved against money penalty, and will penetrate any disguise. Hence it will not serve to call a true penalty liquidated damages. However, contracts do mean what they say, and if the parties call a provision liquidated damages, the court ought to accept it until it is shown that it is a penalty. How can it be shown? Obviously only by proof that nobody could honestly suppose that the provision would only cover the obligee's loss; if that is shown, then the mere words used will yield, but the court will not start with a presumption against what the parties say they meant. Sun Publishing & Printing Co. v. Moore, 183 U. S. 642, 22 Sup. Ct. 240, 45 L. Ed. 366. Now there is not the slightest justification here for disregarding the formal expression of the parties' intention. The yacht had a charter value, uncertain but real, one which this suit shows to be hard of proof. Both sides agreed that she had it, by the very best of evidence—their willingness to let and hire her at the same sum for the first 60 days. Nothing could be more unreasonable than to disregard their deliberate words and to try to substitute some other measure. We think it not necessary to consider whether the provision here is really liquidated damages, or rather an extension of the charter. Morgan v. Garfield & Proctor Coal Co. (D. C.) 113 Fed. 520.

Quite other considerations apply to the period after June 27th. Whatever may be the prima facie case arising from the charter rate itself (Dewar v. Mowinckel, 179 Fed. 355, 102 C. C. A. 539; Smith v. The Governor Ames, 187 Fed. 40, 109 C. C. A. 94), it applies only when the parties have not gone into proof. Now there was only one qualified witness called on this subject and he swore to values considerably less than the amount fixed in the charter party. It is quite apparent from his testimony that $5,000 for the month in question was the figure most satisfactory to him, though larger sums he regarded as possibilities. We believe that in view of the very stringent rule in The Conqueror, 166 U. S. 110, 17 Sup. Ct. 510, 41 L. Ed. 937, a proper proportion of $5,000, less owner's charges, $670, is the utmost that should be taken as the hire value. It is indeed a little doubtful whether any allowance at all should be made under The Conqueror, supra, the

proof being only at the mouths of experts. However, the grounds for that decision are, we think, to be found especially on pages 133 and 134 of 166 U. S., on page 519 of 17 Sup. Ct., 41 L. Ed. 937:

"She was purchased by her owner for his personal pleasure, and there is not an atom of testimony tending to show that he bought her for hire, or would have leased her if he had been able to do so, even for the large sum of $100 per day fixed as her value.

"Again, the court may properly take judicial notice of the fact that the yachting season in our northern waters practically comes to an end before the 1st of November, and, as The Conqueror was seized on August 27th, during more than one-half the time for which demurrage was allowed she probably would have been laid up at her wharf. It is true there was a possibility that her owner might have desired her for use in a winter's cruise to tropical waters; but there was not the slightest evidence of that, and the contingency of her being so used was too remote to justify an allowance upon that basis."

Here there is evidence that she would have been leased in June and July, just as she was leased in August. The season was at its very height, and we cannot say that the proof was speculative in spite of a narrow market. The Conqueror, supra, has, however, established so strict a proof that we are not disposed to allow more than the lowest value.

Interest upon the demurrage up to June 27, 1911, was certainly proper. Milburn v. Boxes of Oranges and Lemons, 57 Fed. 236, 6 C. C. A. 317. A question may arise regarding the demurrage for the last 22 days, especially in view of the decision of a majority of this court in The Sitka, 159 Fed. 1023, 85 C. C. A. 488, affirming without opinion the District Court in 156 Fed. 427, a collision case. We do not see, however, any reason not to apply the rule applicable in actions at common law upon contracts where the damages are not liquidated, which leaves interest as matter of discretion, nor do we see any reason to differ with the learned commissioner in his allowance of interest.

With the modifications indicated, the decree is affirmed, without costs in this court.