THE NAT E. SUTTON.
THE BLOOMFIELD.

THE HOLBROOK.
THE ARTHUR L. HABER.

In re W. E. HEDGER CO., Inc.
LEACH v. HEDGER TRANSP. CO., Inc.

CANADA ATLANTIC GRAIN EXPORT CO., Inc., v. SAME.

Nos. 10436, 10016, 9714.

District Court, E. D. New York.
June 24, 1930.

230

Macklin, Brown, Lenahan & Speer, of New York City (Edmund F. Lamb and J. Dudley Eggleston, both of New York City), for W. E. Hedger Co., Inc., and the Sutton and the Holbrook.

Otto & Lyon, of New York City (Henry E. Otto, of New York City, of counsel), for Canada Atlantic Grain Export Co., Inc.

Bigham, Englar, Jones & Houston, of New York City (Richard F. Shaw, of New York City, of counsel), for David E. Leach.

Single & Single, of New York City (Forrest E. Single and George B. Warburton, both of New York City, of counsel), for Hedger Transp. Co., Inc.

William F. Purdy, of New York City, for the Bloomfield.

BYERS, District Judge.

On October 14, 1926, a tow was proceeding east through the Barge Canal, made up of the tug Nat Sutton, and the barges Bloomfield, Haber, Mercer and Lenahan, in the order named.

There were two hawsers leading from the stern of the tug to the first barge, of approximately 60 feet in length; the barges were close coupled, and, on the second and fourth, there were steering wheels rigged to affect the course of the tow by "pinching" or "crimping."

Passage of guard gate No. 13 was accomplished through the starboard draw; this necessitated an inclination to port to attain the center or thereabouts of the channel. At approximately 600 feet east of the guard gate, the canal inclines to the south, the turn being apparently 45 per cent. The length of the flotilla was from 580 to 600 feet. The engine speed was 2½ miles per

hour, aided by a following current of ½ mile, at the time in question, so that the attempt was being made to round the turn at a total speed of 3 miles per hour.

The channel is about 125 feet wide, and the canal, from shore to shore, is about 200 feet. The bank inclines on both sides, above and below the canal surface, which indicates shallow margins of approximately 37 feet on each side of the channel.

The barges were better than 100 feet long (the Bloomfield was 112 over-all) and were from 30 to 33 feet in width, and drew 10 feet. It will be seen that, emerging from the starboard guard gate, the tow had to incline to port, and round the turn so that the barges would swing clear, and that allowance had to be made for their inertia and the action of the current. In the execution of this feature of the voyage, the barge Bloomfield fetched up at her port corner forward, coming in contact with the bank of the canal on that side. In so doing, her bottom was penetrated by a rock, 24 inches by 28 inches by 18 inches, weighing about 200 pounds, which became imbedded in the underside of the barge about 2½ feet from the port side and involved the second, third, and part of the fourth planks from the bow. The adjacent surface was so affected that, while the rock remained imbedded until repairs were effected on the return of the barge to Buffalo, water was made so rapidly and extensively that, at about a mile or less from the place of this happening, the barge was detached from the tow, and was gently grounded by the tug Sutton on the port bank of the canal, below the Holley lift bridge.

A consideration of the evidence has created the distinct impression, which would be embodied in a finding, if that now were appropriate, that this result was due to negligence on the part of the tug Sutton.

The discussion will proceed on that basis. Also it is considered that the tug and the barges were seaworthy when they left Buffalo.

It was stipulated, at the end of the trial, that the Bloomfield be exonerated. The barge Haber, while named in the libel filed by the cargo owner, was never served, and is not in the case.

The Bloomfield encountered further misfortune on her next trip to New York, whereby a libel was filed by her owner against the tug Holbrook, having the same legal status as the Sutton respecting ownership and control, and the cause involving the former was tried as a supplement to the consolidated cause, and will be separately treated for the purposes of opinion.

The legal consequences which flowed from the first grounding of the Bloomfield have been the subject of discussion in the various briefs of counsel, and are not free from perplexity by reason of the conflicting views asserted, and the ambiguous method chosen by certain of the parties in which to express their legal relations. The situation may be thus summarized:

█ The tug Sutton is owned by W. E. Hedger Company, Inc., a New York corporation, hereinafter called Hedger. By a written agreement, dated March 13, 1925, it employed, designated, and appointed Hedger Transportation Company, Inc. (a New Jersey corporation, hereinafter called transportation company) operator, to manage and operate, on behalf and for the account of Hedger, the tugs Sutton and Holbrook, and perhaps other vessels not now involved. The contract is without limit as to duration, and the litigation has proceeded on the theory that this contract was in effect at the time of the incidents under examination. These two corporations had a president in common, Mr. W. E. Hedger.

It is unnecessary to discuss at length the precise character of this contract. For present purposes, it is considered as having accomplished the same purpose as would a demise charter. Possession, custody, control, maintenance, and management passed to the transportation company. The word "dominion" seems not to occur in the instrument, but was, in fact, imparted and exercised. The reasoning employed in Hahlo v. Benedict (C. C. A.) 216 F. 303, seems to apply to this contract.

No proof was offered on the part of the transportation company to demonstrate that anything but bare legal title with the right of access survived to the Hedger Company, as the result of the contract. The employment of masters and crew was intrusted to the operator, and the responsibility of deciding upon seaworthiness rested upon the latter. The fact, that disbursement in excess of $5,000 could not be made without the written consent of the owner, did not limit the quality of proprietorship, or possession. The compensation of the operator was fixed at 5 per cent. of the net profits. But the substitution of this for fixed compensation to the owner did not affect the dominion or control over navigation, so long as the agreement remained in effect.

Thus it is concluded that the transportation company was liable for the negligence of the Sutton.

The barge Bloomfield was owned by David E. Leach and, by agreement dated April 13, 1926, was chartered by the transportation company for the canal season of 1926. The barge is recited to be in thorough seaworthy condition, and is so to be maintained by the owner.

■ "Charters of barges without motive power, accompanied by a bargee paid by the owner, are demises", says the Circuit Court of Appeals for this circuit, citing cases, in Bushey v. W. E. Hedger & Co., Inc., 40 F. (2d) 417, decided April 7, 1930.

Such was the relation here established, and, in the carriage of the cargo here involved, the Bloomfield was subject to the control of the tug Sutton.

The transportation company, being thus the owner pro hac vice of the Sutton, and the Bloomfield, as well as the other barges not legally involved in this litigation, entered into contractual relations with the Canada Atlantic Grain Export Company, Inc., hereinafter called the Canada-Atlantic, in this wise:

On October 7, 1926, Carr, a broker, procured the transportation company, as owner or agent, to enter into a booking memo or contract with Canada-Atlantic, as charterer, whereby the first-named undertook to furnish insurable canal tonnage for grain (barley), namely four boats to a fleet as now operated by the transportation company, loading port Buffalo, October 8/9, 1926, destination New York, rate 5½ cents, net, to the boats, insurance to be placed by and for account of charterers, carriers liability to be placed by and for account of transportation company, "subject to New York Produce Exchange Canal Grain Charter Party No. 1, as amended August 6th, 1925, and April 1, 1926," usual brokerage of ⅛ cent per bushel due Carr "from Agents."

This was signed by the president of the transportation company, "Owners or Agents."

The said charter party, so made the controlling factor, contains the following:

"The boat owner and/or operator and/or carrier shall be responsible for all damage caused by their negligence or fault but shall not be liable for losses caused by dangers of navigation, fire or collision, except where caused by their negligence or fault."

For present purposes, this is construed to mean that the transportation company was agreed to be liable for two kinds of damage, i. e., unclassified if caused by its negligence or fault; and that occasioned by dangers of navigation, fire, or collision, if caused in the same way.

There is a further document which is viewed askance by various counsel, according to the exigencies of advocacy.

It is called a "canal bill of lading," and concededly was issued by the transportation company, and never repudiated by the Canada-Atlantic, but is presently not accorded deference by any one. It is not a negotiable bill of lading, and such status is not to be assigned to it. This cargo was covered by a Lake B/L according to the understanding of the parties, which was the shipping document for banking and delivery purposes at New York.

It was, however, a receipt for the cargo, and, with singular dexterity, its author was able to include within its corners an assumption by the carrier of liability for "all damage caused by the boat or the carrier," and, simultaneously, the benefit of all exemptions contained in the Harter Act (46 USCA §§ 190–195) and the legislation providing for the limitation of liability on the part of the shipowners.

■ A bill of lading issued by a master cannot alter the terms of a charter party. The G. R. Crowe (C. C. A.) 294 F. 506.

This document, which was not a true bill of lading as has been explained, was issued in Buffalo, by one Weidner, a marine superintendent, employed by both Hedger and the transportation company, to the Canada-Atlantic (through their agent in Buffalo) and referred to 32,000 bushels of barley laden on the Bloomfield pursuant to the booking agreement already referred to. It was, therefore, the act of the transportation company, and in line with a recognized course of dealing between these parties. It was something of a higher significance than a true bill of lading issued by the captain of a ship which might be in derogation of the terms of a charter.

Without presently assigning a definite and precise status to this document in fixing the relations of the parties, it may be proper to observe that it cannot be entirely ignored.

That the transportation company was a private carrier of this cargo admits of little or no discussion.

■ The bearing of the Harter Act (46 USCA §§ 190–195) now requires discussion; it will be assumed, for present purposes, that, if the contract of affreightment had been silent with respect to the assumption of liability on the part of the transportation company, the latter would have been entitled to the exemptions created by that statute, namely, that "neither the vessel (as to its composition later reference will be made), her owner or owners, agent or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel. ✳ ✳ ✳ "

The fact is, however, that the contract of affreightment is not silent on the subject. It incorporates by reference the twofold liability for negligence hereinbefore referred to.

That which happened to the Bloomfield was an unclassified act of negligence, i. e., an error in navigation on the part of the tug, which caused the loss and damage giving rise to this litigation. It was in terms anticipated by the contract of the parties, and no case has been cited by counsel or found by the court, which holds that a private carrier lacks the legal capacity to contract to assume responsibility for a happening which could not be visited upon it because of the Harter Act (46 USCA §§ 190–195).

■ The legally nondescript document called the "canal bill of lading" is the only disturbing element in reaching this conclusion, but reflection has induced the belief that it neither adds to nor detracts from the essential relations of the parties.

It has been assumed that the Harter Act would be available to the transportation company, even though reference thereto were not to be found in the contract of the parties; therefore, the specific reference to the Harter Act in the receipt, or canal bill of lading, does not enhance the immunity from responsibility which would be enjoyed by the carrier, except for its express assumption of responsibility for negligence, recited in the produce exchange charter party and echoed in the canal bill of lading.

If the assumption in favor of the private carrier with respect to this statute be unwarranted, the result is not changed, for the reason that the canal bill of lading, which by common consent is relegated to an inferior status in the contractual relations of the parties, asserts, in one paragraph, an assumption of responsibility, and, in a following paragraph, the benefits of the Harter Act (46 USCA §§ 190–195), which would destroy the assumption. These two provisions are mutually exclusive and destructive, leaving the parties to their respective rights and responsibilities as set forth in the produce exchange charter party, upon which the original booking agreement was poised.

And so the controversy is resolved against the application of the Harter Act to the parties to the contract of affreightment here involved.

■ There remains to consider the relations between the owner of the Bloomfield and the transportation company. In the interest of brevity, it may be stated that the decisions of this court in The Dutchess, 15 F.(2d) 198; and The City of New Bern, 16 F.(2d) 506, will be followed, and the Bloomfield and the Sutton will be regarded as one vessel, as between themselves, so far as a remedy in rem against the latter is concerned, on the part of the Bloomfield.

Reference should now be made to the various causes now in process of decision.

No. 9714 was instituted by Canada-Atlantic's libel against the transportation company and the tug Sutton and barge Bloomfield, in contract and cargo damage.

The breach of contract is the failure to deliver the barley, and the negligence is the happening heretofore recited.

The owner of the Bloomfield filed answer, making claim to his vessel, pleading the Harter Act (46 USCA §§ 190–195), limitation of liability, and that the negligence, if any, was that of the transportation company.

The answer of the transportation company admits the failure to deliver the barley, and denies responsibility for the accident on the theory that the obstruction (the rock) was encountered in the canal, and that the happening was the result of a danger or peril of navigation; pleads the Harter Act (46 USCA §§ 190–195), and alleges that the charter party called for the carrying of insurance by the libelant for the mutual benefit of the libelant and respondent.

■ The latter contention is effectually answered by the provisions of the booking memorandum heretofore quoted, by the terms of which each party is to provide insurance for its own assumption of risk.

From what has been said, it follows that the libel must be sustained as against the transportation company for its breach of con-

tract, with costs; and against the Sutton for its negligence, with costs.

The exoneration of the Bloomfield, at the close of the trial, requires dismissal of the libel as against it, with costs.

No claim was filed to the Sutton, by its owner, in this cause.

No. 10016 was instituted by David E. Leach, libelant, as owner of the Bloomfield, against the transportation company and the Sutton and Holbrook, and has for its purpose the recovery of damages for the failure of the transportation company to redeliver the barge in the order and condition in which it was received by the charterer, the damage arising from the fault and negligence of the Sutton being stated at $7,000 and of the Holbrook at $1,500.

The answer of the transportation company avers that the damage occasioned while the barge was in tow of the Sutton was the result of the barge's coming in contact with an obstruction in the canal, and was not due to the fault or negligence of the said tug. That the Bloomfield sprang aleak when in tow of the Holbrook on the second occasion, from an unknown cause, but not by reason of the fault or negligence of the Holbrook. That, under the terms of the charter, the owner is obliged to insure for the benefit of both himself and the charterer.

No such provision in express terms is recited in the charter.

The Hedger Company filed claim as owner of the Holbrook only, and made answer, denying that there was any fault or negligence *on the part of the Sutton.*

Likewise as to the Holbrook. As to the latter, denial is made of the allegations in the libel concerning fault and negligence on the part of the Holbrook, but it is alleged that the leaking of the barge and any damage sustained by it, while in tow to the Holbrook, were due to the unseaworthy condition of the barge.

So far as the Sutton is concerned, it has been said that the damage which was done to the Bloomfield was caused by the negligence of the tug. A remedy in personam is available to the libelant in that behalf, but no remedy in rem against the tug.

Therefore, the libel against the Sutton must be dismissed, but without costs.

The Holbrook aspect of the controversy will be separately considered hereinafter.

No. 10436 is a limitation proceeding in which the Hedger Company, as owner of the Sutton, is the petitioner. The facts as to the mishap are set forth, and the fault is charged to the barges and the alleged unseaworthy condition of the Bloomfield.

As has been stated, the latter has been exonerated, by stipulation at the close of the trial.

It is alleged that the leaking and sinking were occasioned, etc., without the privity or knowledge of the petitioner. Also the Harter Act is pleaded.

Leach, as owner of the Bloomfield, filed answer, denying knowledge, etc., as to the privity, etc., of the petitioner; alleging the fault of the Sutton, and asserting its claim of $7,000 in this proceeding.

The Canada-Atlantic also answered, alleging the fault of the Sutton and the barges, asserting its claim for its cargo loss at $21,886.96, and denying the allegation as to lack of privity on the part of the petitioner.

From what has been said in discussing the nature of the undertaking by the transportation company under the produce exchange charter party, this case seems to fall within the reasoning of the opinion of the Circuit Court of Appeals in The E. S. Atwood, 289 F. 737.

The personal obligation assumed by the transportation company should not be visited upon the owner, even though here, as in the Atwood Case, perhaps, there was a cleavage between ownership and operation, based upon a "family arrangement."

The owner has, in legal effect, surrendered the Sutton, and is entitled to the limitation sought.

The claim of the Bloomfield, so far as it is in rem and against the Sutton, is adjudged not to lie, for reasons heretofore stated.

There remains but to dispose of the libel filed by the owner of the Bloomfield against the transportation company and the Holbrook.

Following the misadventure which befell the Bloomfield while in tow to the Sutton, she was returned to Buffalo, and there such repairs were effected that she was again restored to the grain-carrying trade. The testimony as to the repairs is meager, being the statement of the captain of the barge, that, in Buffalo, "Mr. Leach had bottom planks put in, and one thing and another, repairs to put the boat in ship-shape form to carry another load of grain." This was later amplified to include caulking and repairs to hatches.

The barge was again loaded with grain, 26,000 bushels of Manitoba wheat, and it will be assumed that this was only after the interested parties were duly assured and convinced that the Bloomfield was in satisfactory condition to receive and carry this cargo. Leaving Buffalo in tow to the Holbrook—the legal status of which for all purposes is the same as that of the Sutton—and with three other barges, departure was had November 18, 1926. Again the Bloomfield was the head barge in the tow, and there was a steering wheel on the second and fourth barges, lines being connected as in the previous trip.

The towing hawsers were again about 60 feet in length, and all incidents of control and handling were as in the case of the Sutton.

On Friday morning, November 26th, at 1:20 o'clock, as the tow was approaching the lock wall at Little Falls—lock 17—the captain of the Bloomfield says he noticed that his boat was too close to the port bank, and that the barge was "sort of jumping up and down," and that he could see the stern of the Bloomfield raising above the bow of the following barge in an up and down motion.

It will be recalled that these barges were close-coupled, and all of them of substantially the same dimensions. It would be natural to expect that not one, but all, would have been similarly affected by too great a proximity to the port wall or bank, but no testimony of similar damage to other barges has been offered.

The captain estimates that the port side of his barge was about 5 or 6 feet from the edge of the bank.

The captain says he sounded his boat and found her to be leaking, but not so badly that he could not take care of the water with his own pumps. This condition was constant for the remainder of the voyage.

The barge arrived in New York on December 2d, and tied up at Forty-Ninth street, North River. Thence to Thirty-First street, Brooklyn, where cargo was discharged to a steamer, and on December 7th the barge went on dry dock. The captain there saw the bottom, and said the whole port side looked as if it had dragged over rock, "and one place where the hull was, where the new plank was put in was a rock that big" (size of two fists held together). This affected plank was one of the new ones put in at Buffalo. There were other bits of stone in the bottom.

The captain's estimate of distance from his port side to the bank cannot be relied upon because of his uncertainty and self-contradiction concerning other distances involved. Nor is his memory of any assistance to him with respect to other matters concerning this particular experience, which would be requisite to enable the court to base a finding upon his unsupported testimony.

It is not deemed that the libelant has sustained the burden of proof in this assertion against the Holbrook. In order to reach a finding that the Holbrook was at fault, or, indeed, that the injury to the hull of the Bloomfield was occasioned as alleged by the libelant, more persuasive evidence would have to be adduced than is found in this record. The libel should be dismissed as against both the transportation company and the Holbrook, with costs.

A decree should be prepared in the consolidated cause, embodying the foregoing views, on eight days' notice.