### THE RICHMOND.

(District Court, D. Massachusetts. February 18, 1909.)

#### No. 129.

1. SALVAGE (§ 30*) — RESCUE OF GROUNDED VESSEL — AMOUNT OF COMPENSATION.

The steel tug Richmond, 135 feet long and worth before her injury $54,000, grounded in a fog on the breakwater at Rockport, Mass., at the extremity of Cape Ann, where she was fully exposed to the seas. The top of the breakwater was of loose rocks 40 to 50 feet wide and about even with the surface at low tide. The Richmond passed over until the break-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

water was about under her center, leaving both her bow and stern without support at low tide. She was towed off at the next high tide by the tug Enterprise, but in the meantime suffered injury, to repair which cost $3,134, and there was great danger of further injury if she remained over another low tide. There was but one other vessel that could have reached her in time to prevent her so remaining. The actual pulling by the Enterprise occupied but about 15 or 20 minutes, and she went to the Richmond in the night from the port where she was lying and was gone about 2 hours; the Richmond being able to proceed under her own steam. The service was not especially dangerous. *Held*, that under the circumstances, and in view of the peril to which the Richmond was exposed, the Enterprise was entitled to an award of $1,500, $1,000 to the vessel and $500 to the master and crew.

[Ed. Note.—For other cases, see Salvage, Dec. Dig. § 30.*

Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

**2. SALVAGE (§ 18*) — SERVICE RENDERED BY CHARTERED VESSEL — RIGHT TO AWARD.**

Where a tug under a time charter which was not a demise of the vessel rendered a salvage service at night, at a time when she was not actually working under the charter but was supposed to be laid up in port, the owner, and not the charterer, was entitled to the salvage award.

[Ed. Note.—For other cases, see Salvage, Dec. Dig. § 18.*]

In Admiralty. Suit by Charles Walker, on behalf of the steam tug Enterprise and her master and crew, against the steam tug Richmond, for salvage. Decree for libelant.

Blodgett, Jones & Burnham, for libelant.
Elder & Whitman, for the Breakwater Co.
Wing, Putnam & Burlingame, for claimant.

DODGE, District Judge. This libel for salvage is brought on behalf of the owners of the steam tug Enterprise and on behalf of her master and crew on board at the time the alleged salvage services were rendered. The services are alleged to have been rendered to the Richmond on Sunday and Monday, July 19 and 20, 1908, and to have consisted in towing that vessel off the breakwater at Sandy Bay, near Rockport, Mass., on which she had grounded while bound from the Kennebec river to Boston.

The Breakwater Company, an Ohio corporation, has filed an intervening libel or petition wherein it alleges that, when the services described in the libel were rendered, it "had full right to the services of and controlled the steam tug Enterprise by contract"; that the Richmond was saved, through its services, "by its said tug and the captain and crew thereof and none others." It prays for an award to be made to it "for its said salvage services."

That salvage services were rendered to the Richmond by the Enterprise and her crew, whoever may be the persons entitled to receive the compensation awarded therefor, is not disputed. Nor is it disputed that the services consisted, generally speaking, in towing the Richmond off the breakwater referred to, upon which she had grounded. The first question is: What is the proper amount to be awarded for those services as compensation?

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The elements which are to govern in fixing the amount I find to be as follows:

1. Value of property saved: It was agreed that the Richmond was worth $54,000 when she grounded on the breakwater, and that the cost of repairing such injuries as resulted from her grounding or lying aground was $3,134; so that her value as saved was $50,866.

2. Danger from which the property was saved: The Richmond is a steel tugboat having a net tonnage of 196 tons. She is 135 feet long, carries a crew of 16 in all, and was drawing at the time 16½ feet aft and 11 feet forward. She ran aground on the breakwater at about 4 o'clock in the afternoon of Sunday, July 19th, in a fog. When she ran aground she had been going at reduced speed for some time, and her engines were reversed shortly before she struck. She ran aground without any violent shock or jar.

The breakwater referred to runs from Avery's Ledge, off Rockport, northerly, in a straight line, for half a mile or more. It then turns at a considerable angle and runs for a further distance, in a straight line more nearly westerly than northerly. The Richmond grounded on that part of the breakwater which runs northerly from Avery's Ledge, at a point 800–1000 feet north of the ledge. The breakwater is composed of granite in loose blocks and is from 40 to 50 feet wide on top. The rocks composing it show at intervals above water at low water so that the course of the breakwater can then be seen. At high tide they are all covered with water and invisible.

When the Richmond grounded the tide was ebbing, and it had been ebbing for an hour or more. She ran upon the breakwater and lay upon it about at right angles to its course at that point. About half her length ran upon or over the breakwater. She rested upon it for a distance equal to its width at that point from her main rigging forward. Her stem was well out beyond the breakwater on its easterly side and had deep water under it, as did her after part on the westerly or inner side. She lay about on an even keel. There was no substantial change in her position during the low water following her stranding and until the tide was nearly at its height on the next high water, occurring between 3 and 4 o'clock on the morning of Monday, July 20th. At that high tide she was taken off, as is below stated.

The danger to a steel vessel like the Richmond, necessarily involved in lying supported by rocks for a small portion of her length only, and without corresponding support fore or aft, as the tide fell, for the remainder of her length, is obvious. Her water tanks and boiler were emptied after she grounded in order to lighten her as much as possible. Her draft was thereby reduced some 2½ feet. The damage sustained, nevertheless, from lying aground in the manner described during one low tide only, was serious. She was dry-docked at Boston immediately after being floated, and was a few days later surveyed for repairs at Newport News. These examinations of her bottom showed extensive indentation of her plates on both sides of her keel where she had rested on the breakwater, a number of butts in her plating started, the cement under her boiler loosened and cracked, and several joints in steam pipes in her engine room started. There were minor injuries to her propeller and machinery. Repair of

these damages cost $3,134, as has been stated. In my opinion these facts sufficiently show that the danger of further serious structural injury to be apprehended from letting the tug stay on the breakwater during another low tide was very considerable, and that it was of very great importance to her safety that the opportunity of floating her at the next high tide should not be lost.

The place where she lay aground on the breakwater is of course an exposed place, being at the extreme end of Cape Ann and without shelter from the open ocean. The danger of injury from exposure to heavy seas there, however, as distinct from the danger involved in having to lie aground in the manner described, does not seem to me to have been of great importance. No doubt during the hours she spent on the breakwater there was at times "quite a roll on," as some of the witnesses stated. At low water, however, no sea could have affected her very much; it was only as the tide rose and she became more nearly water borne that it would have been possible for any rolling or pounding on the bottom to have taken place. The evidence shows that she did not as a matter of fact move, roll, or pound at all during the most of the time she lay aground. During the few minutes before she came off, when the rising tide had begun to lift her, there appears to have been a little motion and occasionally something which might be described as pounding on the bottom. No doubt any long continuance of this would have been very undesirable for her. Yet the danger involved in it, so long as the sea was no heavier than that running at the time, does not appear to have been serious in comparison with the danger involved in the strain of lying aground as above described. Under the circumstances shown, it seems to me that neither during the time she lay aground, nor during the day following her floating, was the sea running heavy enough to be considered a serious danger in itself.

3. Possibility of relief other than that afforded by the Enterprise: The lightkeeper from Straitsmouth Island appears to have been the first person to visit the Richmond after her grounding. Attracted by whistle signals from her, he came out to her in a dory accompanied by his son. By him, and later by other persons who came off to her later, the Richmond's captain sent messages ashore to be telephoned to his owners asking to have the Boston Towboat Company send two or three tugs to his assistance. These messages were received by the owners representative in Boston, and an arrangement to send tugs made with the Boston Towboat Company. When this arrangement was made, or when, according to it, the tugboats were to be sent, did not appear. Nor did it appear that any tugboats were ever actually dispatched in pursuance of it. No reason appears for believing that any tugboats so dispatched would have reached the Richmond in time to float her on the next high water. No attempt appears to have been made to get the aid of any tugboats from other places except the Enterprise, in time for that tide. Ultimately, of course, tugboats enough to render any assistance desired could have been had from Boston or elsewhere; but there is little reason to believe that any of them would or could have been made available by the time of the next high water, with one exception. There was, as will appear, another tug besides the Enterprise at

Pigeon Cove which might have rendered, so far as appears, all the aid which the Enterprise actually rendered.

4. Number of salvors and property employed by them: The Enterprise is 70 feet 6 inches long, 17 feet 6 inches beam, draws 9 feet 6 inches, has a gross tonnage of 61 and a net tonnage of 30 tons, is a wooden vessel, and was built in 1893. $15,000, alleged as her value in the libel, must, it would seem, be an overestimate rather than an underestimate of the true value of such a tugboat. But, as will appear, the case is not one in which the value of the salving vessel is a fact of importance enough to require a careful determination of it. At the time these services were rendered, the Enterprise had a regular crew of six all told, but the whole crew, as will appear, did not participate in all the services rendered. The tug was regularly employed in towing stone cargoes for the Breakwater Company between a quarry at Folly Point and the breakwater, which has been described. She had a berth at Pigeon Cove which she regularly occupied when not engaged in active work.

5. Nature of services rendered, time occupied, and risks encountered: Attracted by whistle signals blown by the Richmond after her stranding, the Enterprise left Pigeon Cove on Sunday afternoon, July 19th, and went to where the Richmond lay, a distance not exceeding two miles. She had on board her captain, Joseph T. Riley; her mate, J. Frederick Foley, who acted as engineer during the trip; Fred E. Bryant, fireman; and Walter Bender, cook; also several passengers. She got to the Richmond about 5 p. m., which vessel had then been aground about an hour; the tide falling all the time. The Richmond had begun emptying her tanks and boilers, but had not yet finished doing so. At the request of the Richmond's master, the Enterprise took a hawser from the Richmond's stern and pulled on it until after 6 p. m.; the Richmond's engines also working astern meanwhile. During the last 15 or 20 minutes of the time the Enterprise was pulling, another tug from Pigeon Cove, the H. G. Nichols, took another line from the Richmond's stern and pulled also. None of the pulling then done had any effect toward starting the Richmond. It was doubtful from the first whether any effect could be produced after the tide had fallen so far, but the experiment was tried at the request of the Richmond's master. Both tugs returned to their respective berths before 7 p. m.

Before leaving the Richmond at this time the captain of the Enterprise asked if further assistance from her was desired at the high water on Monday morning. He was told in reply that the Boston Towboat Company's tugs had been sent for; but, if they did not arrive in time for the high tide referred to, the Richmond would signal for further assistance from the Enterprise.

The Enterprise got ready to start, in pursuance of this arrangement, before high water. On board the Richmond, as it was found that the rising tide was beginning to float her, and as nothing was seen or heard of any boats from Boston, the agreed signals to summon the Enterprise were sounded. In pursuance of them the Enterprise at once started, at 2 a. m., or soon after, with all her crew on board except her mate, who failed to join her in time. The persons then composing her crew were Capt. Riley, Orlando H. Vessels, engineer, Fred E. Bryant, fire-

man, Walter Bender, cook, George C. Marbel, deck hand. On arrival at the Richmond she at once took that vessel's hawser and began to pull. It is claimed on the Richmond's behalf that she came off the breakwater immediately, under a steady pull, and without any "jumping" on the hawser. It is claimed on behalf of the Enterprise that the time spent in pulling on the hawser was from 3:15 to 3:45 a. m. as would appear from the entries in the Enterprise's log book, also that some "jumping" on the hawser had to be done to make the Richmond come off. This is the question of fact most in dispute in the case. I am unable to put much reliance in the log book entries of the Enterprise, because they seem to me to have been altered since they were originally made, so as to tell a story different from that which they told at first. On the whole evidence my conclusion is that from 10 to 15 minutes actual pulling was done, and that 2 or 3 "jumps" on the hawser were made before the Richmond came off. After coming off, she was towed by the Enterprise to a point a few hundred yards inside the breakwater, where she anchored. After refilling her tanks and boiler she got her anchor soon after 9 a. m. and went to Boston under her own steam. The Enterprise left her at anchor and returned to Pigeon Cove, which she reached about 4 a. m., and thereafter began her regular day's work for the Breakwater Company at 6:45 a. m.

About two hours' time on Sunday afternoon and about two hours on Monday morning was the time spent by the Enterprise. The distance traversed on each occasion was not over four miles.

The services rendered on Sunday afternoon did not result in any benefit whatever to the Richmond, and, if compensation for them had been contingent upon success, would have deserved no compensation because unsuccessful. They were rendered at the Richmond's request, however, and, in view of the circumstances, on the implied understanding that they should be paid for, whatever the result, at a fair remuneration for the time and labor expended. This I find to be $50.

The services on Monday morning stand upon a different footing. There was a chance but no certainty of success, because no one before the attempt to get her off could certainly tell how firmly aground the Richmond was. The Enterprise's attempt to tow her afloat was made subject to the chance of failure, and it succeeded. The assistance rendered by the Enterprise I must regard as having been necessary to the Richmond, because it seems to me highly improbable that she could have got off without aid, deprived as she was by the emptying of her boilers of motive power of her own and having nothing but kedging to rely upon. The Enterprise, then, provided the assistance essential to the Richmond's safety and provided it at the precise time it was most wanted, that is to say, at the earliest moment when the tide had arisen enough to float her, and soon enough to avoid leaving her a moment longer than could be helped in contact with the breakwater rocks, after pounding upon them had become possible. The labor and time involved were not considerable, as has appeared, and notwithstanding the fact that Pigeon Cove Harbor is not lighted at night and the Enterprise had to find her way to and from the Richmond in the dark, I am unable to believe that she or her crew were exposed to any danger more serious than those to which they were every day exposed. The degree

of promptness and skill displayed sufficiently appear from the facts found above. They were adequate to the occasion, but there was nothing extraordinary about them.

Upon a consideration of all the elements which enter into the question, it appears, therefore, that regarded merely in the light of the time, labor, and risk involved, the Enterprise's services on Monday morning would deserve nothing more than a very moderate compensation, but that a considerable enhancement by way of premium or reward is justified by the large value at risk and the great importance of assistance at the precise time when the Enterprise furnished it; or, in other words, the timeliness of the aid rendered by her. In such cases, as was said in Baker v. Hemenway, 2 Lowell, 501, 505, Fed. Cas. No. 770, the principle followed is "to give tugs what will be a handsome gratuity, enough to induce prompt and even eager assistance, and this would be enhanced slightly by a great value at risk though in no important or definite proportion to value." I shall award $1,500, $1,000 of which is to go to the owners of the Enterprise, or whoever may be held to have the owners' rights to this portion of the award, and the remaining $500 to the master and crew on board on Monday morning, in proportion to their wages. The total amount of the decree against the Richmond, including the $50 awarded for services rendered on Sunday afternoon, which is to go to the owners as ordinary earnings of the boat, will thus be $1,550.

As between the owners of the Enterprise and the Breakwater Company, my decree must be in favor of the owners. I do not think the Breakwater Company has established a claim to any part of this salvage. The charter under which the Enterprise was working for that company was silent regarding any salvage which might be earned during its continuance, nor did it amount to a demise of the tug or make the charterer her owner pro hac vice. Nor did it, as in The Arizonan (C. C.) 136 Fed. 1016; Id., 144 Fed. 81, 75 C. C. A. 239, give to the charterer the entire disposition of all the tug's time and services. The services rendered to the Richmond were performed at times when the Enterprise was not, and was not expected to be, actually working under the charter. If the charterer's coal or water were used in the services rendered to the Richmond, the Enterprise may be liable to pay for what was so used; but I am unable to believe that the charterer thereby acquired any claim upon the salvage compensation. The libel of the Breakwater Company must therefore be dismissed.

There will be a decree in favor of the libelants, Charles Walker and others, alleged in their libel and the amendment thereto to have been the owners of the Enterprise, for $1,050, and in favor of Joseph C. Riley, master, Orlando H. Vessels, engineer, Fred E. Bryant, fireman, Walter Bender, cook, and George C. Marbel, deckhand, the crew on board during the services rendered on Monday morning, for $500, the same to be apportioned as above directed.