GIBSON et al. v. MANETTO CO.

(Circuit Court of Appeals, Fifth Circuit. March 5, 1912.)

No. 2,219.

SHIPPING (§ 54*)—CONSTRUCTION OF CHARTER—DEMISE OF VESSEL.

A time charter of a small schooner, "including three men," to be used by the charterer in a business stated, for a monthly hire, *held* to constitute a demise of the vessel, which rendered the charterer liable for her loss through its own negligence, or that of the master or crew.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

Appeal from the District Court of the United States for the Southern District of Florida.

Suit in admiralty by William H. Gibson and another, as owners of the schooner Emma Eliza, against the Manetto Company. Decree for respondent, and libelants appeal. Reversed.

September 18, 1909, William H. Gibson and Joseph H. Gibson, appellants, hired to the Manetto Company, appellee, the Emma Eliza, a small 21 or 22 ton schooner. The contract of hiring was reduced to writing as follows:

"Key West, Fla., Sept. 18th, '09.

"Messrs. Gibson & Bro., Key West, Fla.—Gentlemen: We will pay you for the use of your schooner Emma Eliza, including three men, for use in hauling bark lumber supplies, etc., between Shark River and Key West, the sum of $175.00 per month. You are to keep the boat in repairs.' Payment made monthly.                   The Manetto Co., by A. B. Sanders.

"Accepted: Gibson & Bro."

On September 27, 1909, the said schooner filled with water and sank and became a total loss. Thereupon the Gibsons, appellants, who had not been paid for the vessel, nor for her use, filed a libel against the Manetto Company, praying judgment for the value of the vessel, $2,500, and $175 for her charter for one month. In the libel it was alleged that the loss of said schooner was due solely to the improper manner in which a certain boiler was stowed by the agents or employés of the Manetto Company.

The respondent filed answer, specially pleading that the contract of hiring was in writing and as above set forth, and admitting the loss of the schooner, but denied all negligence and responsibility for the same, and, further answering, said that, at the time it hired or chartered the said schooner Emma Eliza, the said H. E. Bullard was the master of said schooner and placed in command thereof by the libelants; that he, the said H. E. Bullard, was the registered master, as appears by the records of the custom house at Key West, and was such registered master continuously up to the time of the loss thereof, and whose authority as such master was always recognized by this respondent.

On the hearing the libelants proved as follows: Before the Emma Eliza was chartered to the Manetto Company, Sanders, the agent of the company, looked at her with the object of hiring her to take a boiler and bed plate to Shark River; but he and the Gibsons came to the conclusion that she was too small for that purpose. On September 27, 1909, there was, under orders of the Manetto Company, loaded on the deck of said schooner at Shark River, this same boiler and bed plate to be transported to Key West. On the voyage the boiler rolled from the bed and went over the side of the schooner, where it hung by chains, which had been used to secure it to the bed. After ineffectual attempts to release it, the vessel filled with water and sank, and became a total loss. The respondent proved that Bullard, one of the men furnished by the libelants with the schooner, acted and was recognized as master.

On the hearing the District Judge found that under the contract there was no demise of the schooner, and that the libelants' agents were responsible for the bad stowing of the boiler, if there was bad stowing, and that the proximate cause of the loss of the schooner was the negligence of the master of the vessel in failing to note and prevent the slipping and rolling of his cargo, and he further found: "It also appears satisfactorily to the court that it was at the request and desire of the master that the vessel put to sea at night, so as to be in Key West early the next day. The court is satisfied that, had the trip been made in the daytime, and the master watchful and careful about the moving of the chocks and shores, and retained the cargo where it was originally placed, there would have been no trouble, and therefore the proximate cause of the loss was the negligence of the master. The court fails to find the respondent or its agents in any way liable for the loss of the vessel, and the libel must be dismissed; each party paying its own costs."

On the dismissal of the libel, the libelants below sued out this appeal.

Jefferson B. Browne, for appellants.
G. Bowne Patterson, for appellee.

Before PARDEE and McCORMICK, Circuit Judges, and MAXEY, District Judge.

PARDEE, Circuit Judge (after stating the facts as above). Taking the written contract between the parties—and we do not find it materially varied by action of the parties thereunder—we are of opinion that there was such a demise of the schooner Emma Eliza as put the respondent company in complete control of the same and rendered it responsible for damages resulting to the schooner through its negligence. The general rule is that, where the owner parts with the possession, command, and navigation of the ship, the hirer becomes the owner during the term of the contract, and may appoint a master, and ship the mariners.

In United States v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403, a suit was brought to recover damages under a contract for hiring which provided, among other things, as follows:

"Article 1. That the said Daniel Shea shall provide and furnish to the party of the first part, whenever called upon during the fiscal year ending June 30, 1887, such vessels of the description hereinafter given as may be required to take the place of the vessels now performing service for the U. S. army between New York City and Governor's Island, New York, Governor's Island and Sandy Hook, and New York Harbor generally, respectively, the steamers Atlantic, Ordnance, and Chester A. Arthur. That the vessels furnished as aforesaid must each have an engineer and fireman, and conform to the following conditions, viz.: The steamer to take the place of the Chester A. Arthur must be of about the size and the character of the Chester A. Arthur, and the steamers to take the places of the Atlantic and Ordnance, respectively, must have the capacity for freight and passengers and be of the size and character of the steamer James Bowen. That all the vessels furnished must be staunch, in first-class order in every respect, well equipped, and conform fully to the requirements of the law. It is fully agreed that the fuel required by said vessels so furnished, while in service under this agreement, shall be supplied by the government, and that this contract shall commence on the 1st day of July, 1886. And it is further agreed that the party of the second part shall furnish, when required, the remainder of the crew, consisting of a captain, a mate, two deck hands, and a fireman."

In passing upon that case the court declared the law as follows:

"This case turns upon the construction to be given to the contract of May 28, 1886, taken in connection with the action of the parties thereunder. Was this a contract of hiring or for service? In Reed v. United States, 11 Wall. 591, 600 [20 L. Ed. 220], it was said by Mr. Justice Clifford, speaking for the court: 'Affreightment contracts are of two kinds, and they differ from each other very widely in their nature, as well as in their terms and legal effect. Charterers or freighters may become the owners for the voyage, without any sale or purchase of the ship, as in cases where they hire the ship, and have by the terms of the contract, and assume in fact, the exclusive possession, command, and navigation of the vessel for the stipulated voyage. But where the general owner retains the possession, command, and navigation of the ship, and contracts for a specified voyage, as, for example, to carry a cargo from one port to another, the arrangement in contemplation of law is a mere affreightment, sounding in contract, and not a demise of the vessel, and the charterer or freighter is not clothed with the character or legal responsibility of ownership. * * * Courts of justice are not inclined to regard the contract as a demise of the ship, if the end in view can conveniently be accomplished without the transfer of the vessel to the charterer; but where the vessel herself is demised or let to hire, and the general owner parts with the possession, command, and navigation of the ship, the hirer becomes the owner during the term of the contract, and, if need be, he may appoint the master and ship the mariners, and he becomes responsible for their acts.'

"And subsequently, in Leary v. United States, 14 Wall. 607, 610 [20 L. Ed. 756], Mr. Justice Field thus discussed the question: 'If the charter party let

the entire vessel to the charterer, with a transfer to him of its command and possession and subsequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter party let only the use of the vessel, the owner of the same retaining its command and possession and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the first case the charter party is a contract for the lease of the vessel; in the other, it is a contract for a special service to be rendered by the owner of the vessel. * * * All the cases agree that entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the charterer before he can be held as special owner for the voyage or other service mentioned. The retention by the general owner of such command, possession, and control is incompatible with the existence at the same time of such special ownership in the charterer.'"

The court further said:

"No technical words are necessary to create a demise. It is enough that the language used shows an intent to transfer the possession, command, and control. * * * A demise may be for a day as well as for a year, and may be terminable at the will of the lessor. The pay, by the fourth article, was to be 'for each vessel employed.' Not only this, but the conduct of the parties in the execution of the contract removes all obscurity as to its scope and meaning. As the findings show, the vessel, the James Bowen, was furnished by petitioner, and was accepted and used by the defendants. During the time of its use it was under the exclusive management and control of the defendants. The very condition resulted which is the purpose and effect of a demise—the transfer of the exclusive possession, management, and control. The vessel was not, when injured, returned to the petitioner, but, when the repairs were finished, 'resumed work.' It is insisted by the defendants that there was no demise, because, as claimed, the petitioner did not contract to furnish one vessel for any length of time, and, could, if he wished, change vessels. It is doubtful whether that is a correct interpretation of the instrument, and whether it was in the power of the petitioner, after a vessel had been tendered and accepted by the government, to substitute another therefor. But, even if it were so, the substituted vessel would pass into the exclusive possession of the government, the same as the vessel for which it was substituted. We think little significance is to be attached to the provisions in reference to furnishing a crew or supplying fuel. They were matters of detail, affecting the price to be paid, but throwing no particular light on the question of hiring or control."

This decision seems to control this case, where it is undisputed the entire control of the schooner Emma Eliza was in the contract transferred to the respondent. We so far agree with the trial judge that the proximate cause of the loss of the Emma Eliza may have been the failure on the part of the crew of the schooner to watch the chocks, but in the management and sailing of the schooner the crew were the servants of the respondent. Whether the trip should have been made in the daytime, whether the boiler ought to have been carried on board at all, or whether the crew was negligent in watching the chocks, the libelants were not responsible. The proof in the case is to the effect that the Emma Eliza was worth $2,500. Under the pleadings and evidence, the libelants should have had a decree for that amount.

The decree of the District Court is reversed, and the cause is remanded, with instructions to enter a decree in favor of libelants in the sum of $2,500 and for all costs.