### THE JOHNSON LIGHTERAGE CO. NO. 24.

#### (District Court, D. New Jersey. February 13, 1917.)

1. SHIPPING ☞41—CHARTER—DEMISE OF VESSEL.

    A time charter of a tug, by which the charterer acquires the exclusive possession, command, control, and navigation of her, is a demise, which makes the charterer owner pro hac vice during the charter term.

    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 149–155.]

2. SALVAGE ☞38—SERVICES RENDERED BY CHARTERED VESSEL—APPORTIONMENT OF AWARD.

    As between charterer and owner, even when the charterer was owner pro hac vice under a demise, the determination of the question as to who is entitled to the owner's share of salvage money, awarded for the risk to the vessel, depends both upon who is entitled to the vessel's services and earnings, and upon whom the loss would fall if the vessel had been injured or lost in the salvage operations.

    [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102.]

3. SHIPPING ☞54—DEMISE BY CHARTER—LIABILITY OF CHARTERER FOR INJURY TO VESSEL.

    A charterer under a charter which is a demise, in the absence of provisions in the charter party to the contrary, is only responsible for loss of or injury to the chartered vessel in the event that the injury or loss was due to the failure to exercise ordinary care on his part or that of his servants.

    [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221.]

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. SHIPPING ☞54—CHARTER—LIABILITY FOR INJURY TO VESSEL.
   If a vessel under charter is lost or injured when being used by the charterer for a purpose other than that for which she was chartered, the charterer is liable.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221.]

5. SALVAGE ☞38—SERVICES RENDERED BY CHARTERED VESSEL—DISTRIBUTION OF AWARD.
   A time charter of a tug, which was a demise, contained no provision requiring redelivery of the tug in as good condition as when received, but provided that in case it was used for trips to a named port outside of New York Harbor the charterer should procure insurance, or if that could not be obtained should give a bond to protect the owner from loss or damage to the boat "while on this work." *Held*, that the charter did not preclude the use of the tug for any ordinary purpose, including use for a salvage service, in New York Harbor, nor was the rendition of such a service a failure to exercise ordinary care, which cast upon the charterer all the risk of injury to the tug, but that such risk rested upon the owner, which was therefore entitled to some part of the salvage money awarded for risk to the boat while engaged in such service, while the charterer, having the right to the service and earnings of the tug, was also entitled to a part.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102.]

6. SALVAGE ☞38—APPORTIONMENT OF AWARD—SHARE OF CREW.
   The crew of a tug which salved the cargo of a scow, consisting of large caliber ammunition and high explosives, which rendered the service extrahazardous, *held* entitled to one-third of the salvage award.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102.]

7. SALVAGE ☞38—APPORTIONMENT OF AWARD—CREW'S SHARE.
   The fact that the captain of a tug demised to a charterer was entitled to a share of the charterer's part of a salvage award *held* not to deprive him of the right to share also in the award to the crew.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102.]

8. SALVAGE ☞38—APPORTIONMENT OF AWARD—PASSENGER.
   One who at the invitation of the captain was on board a tug at the time of the rendition of salvage services, but who was not a member of the crew and performed no service, *held* not entitled to any part of the crew's share of the salvage award.

   [Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 93–102.]

9. ATTORNEY AND CLIENT ☞150—DISCHARGE OF ATTORNEY—CONTRACT FOR DIVISION OF RECOVERY.
   Under the law of New York, which prevails in the federal courts sitting in that state, an attorney, although having a contract to conduct a case to an end for a certain share of any amount which he may recover, may be discharged by his client at any time without cause, and in such case is entitled only to the reasonable value of the services rendered.

   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 354–357.]

In Admiralty. Suit against the cargo of the deck scow Johnson Lighterage Company No. 24 to recover for salvage services. On distribution of salvage award.

See, also, 231 Fed. 365.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Foley & Martin, of New York City, for libelants, W. J. Scanlan Co., certain members of the crew, and the captain.

Runyon & Autenreith, of Jersey City, N. J., and Edward W. Norris, of New York City, for James Shewan & Sons, Inc.

E. Curtis Rouse, of New York City, pro se and for Seaboard Equipment Corporation, Silas B. Axtell, and certain members of the crew.

George J. Stillman, of Jersey City, N. J., for Andrew Brown.

HAIGHT, District Judge. The controversy now before the court relates to the distribution of the sum of $25,000, heretofore paid into the registry of this court by the owners of the cargo of the deck scow Johnson Lighterage Company No. 24 in settlement of a suit instituted on behalf of the owner, charterers, captain, and members of the crew of the steam tug John A. Seely to recover for salvage services rendered by them in respect to such cargo. The conflicting interests and the respective claims to the fund will hereinafter appear.

1. The main question is as to how that share of the salvage moneys which would ordinarily be awarded to the owner of a vessel rendering the salvage services (hereinafter referred to as the owner's share) should be distributed as between the charterers of the tug and those who have succeeded to the owner's interest (hereinafter, for convenience, referred to as the "owner"). The tug, at the time the salvage services were rendered, was owned by the Seaboard Equipment Corporation, but was under charter to a partnership trading as W. J. Scanlan Company. The charter party, which consisted of a letter, written by the owner to the Scanlan Company, and accepted by the latter, was as follows:

"New York, December 23, 1915.

"Messrs. W. J. Scanlan & Company, New York Office, 31 Union Sq., New York City—Dear Sirs: Confirming our telephone conversation of this morning, we will charter you bare tug John A. Seely from December 24, 1915, with her present equipment, which is now in good condition, for three months, with option of extending this charter. What we mean by 'bare tug' is tug with her present hawsers, bedding, equipment, etc. You to furnish crew, coal, water, and supplies, which you hereby agree to pay for promptly, and hold the boat harmless for the indebtedness. You also further agree to pay for the marine and fire insurance on this boat covering towing from New York harbor to Edgemere and Rockaway inlet. In case tug John A. Seely works in ice, you will be compelled to sheath bow at your expense; also put an ice breaker on the bow of this boat to protect the hull. You further agree to pay this company five hundred ($500) dollars per month for the bare boat as above described, on the tenth (10th) of each month, for the use of the boat. You also further agree to advance payment on account the first month's rental two hundred and fifty dollars ($250). It being further understood that you are to pay insurance premiums promptly, and in the event that the insurance companies will not place marine insurance for towing on the outside to Edgemere, Long Island, that you are to give this company a bond to protect this company in case of loss or damage to the boat while on this work. It is understood that you are to keep the present engineer that is on the boat at your expense, and in case this engineer resigns his position that an engineer acceptable to this company will be engaged.

"Very truly yours,          Seaboard Equipment Corporation,
          "By John A. Seely, V. President and General Manager.

"This agreement is hereby accepted by W. J. Scanlan & Company, contractors, 31 Union Square, N. Y. City, by Louis H. Friedman, member of firm."

[1] The charterers took possession of the tug on December 24, 1915, furnished their own crew and captain, and were in complete possession and control of it when the salvage services were rendered. Undoubtedly there was a demise of the vessel, so that the charterers were then the owners of her pro hac vice, because they acquired by the terms of the charter, and in fact had assumed, the exclusive possession, command, control, and navigation of her. United States v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403; The Del Norte, 119 Fed. 118, 55 C. C. A. 220 (C. C. A. 9th Cir.); Gibson v. Manetto Co., 194 Fed. 331, 114 C. C. A. 291 (C. C. A. 5th Cir.); Hahlo v. Benedict, 216 Fed. 303, 132 C. C. A. 447 (C. C. A. 2d Cir.).

[2] It is the insistment of the charterers that, in the absence of an express provision in the charter party to the contrary (of which there was none in that in question), a demise of a vessel entitles the charterer to all of the "owner's share" of any salvage money, to the exclusion of the actual owner. The decisions of Judge Brown in the Southern district of New York in The Kaiser Wilhelm Der Grosse (D. C.) 106 Fed. 963, and of the British Court of Admiralty in The Scout, 1 Aspinall's Reports of Maritime Cases (N. S.) 259, and in The Maria Jane, 14 Jurist, 857, are cited in support of that proposition. On the other hand, it is urged on behalf of the owner that such share should be awarded to the one upon whom would fall the loss if the vessel were injured or destroyed while engaged in the salvage operation. In order to ascertain the correct rule, a somewhat extended discussion of the reported cases which have dealt with the question seems necessary:

That part of Dr. Lushington's opinion in The Maria Jane, supra, which is applicable to this case, was merely a dictum. He was dealing with a supposititious case, and expressed the opinion, but not without doubt, that where there was a demise the salvage moneys would inure to the benefit of the charterer. The facts which called for a decision are so different from the facts of this case that his actual decision cannot be considered a precedent on the point in question. While it was held in The Scout, supra, where there was a demise of the vessel, that the owner had no claim to a salvage award, it appears from the opinion that the charterer "in case of damage to the vessel, would have been bound under the charter to repair her. He was bound to deliver her up to the general owners in good condition." Also, while some of the remarks of Judge Brown in The Kaiser Wilhelm Der Grosse, supra (106 Fed. 970), lend support to the charterers' contention, it must be noticed that he also said, before reaching his conclusion:

"It [the charterer] * * * agreed unconditionally to return her [the salving vessel] to the owner in as good condition as it received her, reasonable wear and tear alone excepted. *If the vessel was damaged in any salvage operation, the charterer alone was bound to make good the loss.*"

Thus it appears that in both of those cases the risk of injury to or loss of the vessel during the salvage operations was upon the charterer and not the owner. That was apparently considered a controlling circumstance in each. On the other hand, in The New Orleans, 23 Fed.

909 (C. C. E. D. La.), Judge Pardee held that the salvage money, after deducting the actual expenses of the charterers in the salvage operations, should be divided equally between the charterers, the owner, and the crew. That the charter in that case was one of demise seems clear, for he stated that the cases of The Alfen, Swab. 189, and The Waterloo, 2 Dod. 433 (the latter of which is also referred to by Judge Brown in The Kaiser Wilhelm Der Grosse, supra), were not in point because:

"They refer to charterers who are not in possession of and navigating the ship—were freighters under charter party."

On page 911 of 106 Fed. (in explaining the reason for his subsequent holding) he said:

"At the same time, the owners' property was used to some extent and *was risked in the rendition of services to the New Orleans*. If it were a mere *question of compensation* for work and labor, the owners would be entitled to nothing; but I think the case is very different, so far as it is a question of reward for the use and *risk of property* and *encouragement for the rendition of salvage services*. Why reward a temporary owner and leave out the real owner? Neither one had really anything to say as to whether the services should or not be rendered."

In The Camanche, 8 Wall. 448, 473, 19 L. Ed. 397, Mr. Justice Clifford, in speaking of the rights of charterers to salvage moneys, said that they are not in the same position as owners, unless there be a stipulation in the charter party giving them the benefit of the salvage, "or unless the vessel is chartered and sailed on *their responsibility.*" In The Arizonan, 136 Fed. 1016, 1017 (D. C. E. D. N. Y.), where it was held that there was not a demise of the vessel, Judge Thomas said:

"The general rule is that the owner is entitled to such award [salvage moneys] unless there is a demise of the tug, or the contract of hiring stipulates to whom it shall belong."

He held that the charterer was not entitled to anything. His decision was, however, reversed by the Circuit Court of Appeals of the Second Circuit (144 Fed. 81, 82, 75 C. C. A. 239, 240), and in the opinion of the latter court Judge Coxe said:

"It is true that several text-writers have stated the rule broadly that a charterer is not entitled to salvage unless he becomes the owner pro hac vice, but we are referred to no controlling authority to that effect and are not impressed by the rationale of the rule. The theory of salvage is to reward *all who have contributed anything to the work of saving the imperiled property.* Thus it has included the *risk assumed by the salving vessel*, her services and the services of her master and crew not only, but it has been extended to services rendered by passengers; in some instances, remuneration has been awarded for the risk to her cargo. * * * At the time in question the appellant [the charterer] was entitled to the exclusive use of the tug and to every dollar she might earn during the existence of the charter. On the other hand, the appellee [the owner], not having parted with the ownership, was entitled to remuneration for *any risk* the tug might run while engaging in a dangerous salvage service. We are unable to see why the right to receive remuneration on account of the ownership, which was retained, carries with it the right to remuneration for the services which passed, without qualification, to the appellant. * * * The fact that the charterer would not have been liable for the value of the tug if she had been lost while assisting the Arizonan is not a controlling consideration. * * * The solution of the

present controversy seems plain. The appellee owned the tug, the appellant owned the tug's services. She was in a dangerous occupation and for the risk so run the appellee is entitled to compensation. She did the work of rescuing the Arizonan from the burning dock, and for these services the appellant is entitled to compensation."

There is thus, both in that case and in The New Orleans, supra, a clear recognition of the principle that the owner is entitled to compensation for *the risk* which he incurred and the charterer to compensation for *the services* rendered by the vessel, to which services he was exclusively entitled. The latter is the distinguishing feature between these cases and The Richmond, 181 Fed. 568 (D. C. Mass.). Nor can I see that such a principle is opposed to the decisions in The Scout and The Kaiser Wilhelm Der Grosse, for in both of those cases the risk was borne by the charterer. So whether or not there has been a demise of the vessel has not, I think, been considered by the authorities as the controlling circumstance in the awarding of salvage moneys as between the owner and charterer. Indeed, it is difficult to understand how the mere character of the charter can alone, and irrespective of upon whom the loss or damage to' the vessel would fall, be so considered, when one of the most important elements in salvage awards is the risk incurred by the salving vessel. Any such rule would lead to illogical and unjust results. If a charterer, although an owner pro hac vice under a charter of demise, incurs no risk if the salving vessel is injured or lost in the salvage operations, can the salvage award to him be as large as if he had incurred such risk? On principle it would seem not. Yet if that is so the owner of a vessel and cargo which had been saved would be required to pay less for the same services than if the salving vessel had not been chartered, and not because the services were less valuable, but simply because the charterer, who was entitled to all of the award, ran no risk, whereas the owner of the salving vessel did. Thus the owner would be deprived of any compensation for the risk which his vessel ran, and the one to whom the services were rendered would escape the payment of that part of salvage moneys which represents such risk. If, on the other hand, the award to the charterer would be just as large as if he had incurred the risk, he would receive compensation for something which he never contributed. I think, therefore, that the principle upon which the correct rule must rest is that found, as above stated, in the decision of the Circuit Court of Appeals of the Second Circuit in The Arizonan, supra, and hence I conclude that, as between charterer and owner, the determination of the question as to who is entitled to the "owner's share" of the salvage money depends *both* upon who was entitled to the vessel's services and earnings and upon whom the loss of or damage to her during the salvage operations would fall. At the time the salvage services were rendered in this case the charterer was not only entitled to the services of the tug and to all of her earnings, but was in actual possession, control, and management of her.

[3, 4] It remains, therefore, to ascertain upon whom rested the risk of damage to or loss of the tug while performing the salvage services. The general rule is that a charterer, such as in this case (who is merely a bailee for hire), in the absence of provisions in the charter party to

the contrary, is only responsible for loss of or injury to the chartered vessel in the event that the injury or loss was due to the failure to exercise ordinary care on his part or that of his servants. Clark v. United States, 95 U. S. 539, 542, 24 L. Ed. 518; Sun Printing & Publishing Ass'n v. Moore, 183 U. S. 642, 654, 22 Sup. Ct. 240, 46 L. Ed. 366. See also the following additional cases illustrating the application of the rule: W. H. Beard Dredging Co. v. Hughes, 113 Fed. 680, 682 (D. C. S. D. N. Y.), affirmed 121 Fed. 808, 58 C. C. A. 192 (C. C. A. 2d Cir.); Smith v. Bouker, 49 Fed. 954, 955, 1 C. C. A. 481 (C. C. A. 2d Cir.); Bleakley v. City of New York, 139 Fed. 807 (D. C. S. D. N. Y.); Lake Michigan, etc., Co. v. Crosby, 107 Fed. 723, 724 (D. C. E. D. Wis.); Charles Killam & Co. v. Monad Engineering Co., 216 Fed. 438, 442 (D. C. E. D. Pa.). But it is equally well settled that where, by the charter party, the charterer has, either expressly or by fair implication, assumed the liability for loss or damage to the vessel without his fault, that he is liable if the vessel is lost or injured. Sun Printing & Pub. Ass'n v. Moore, supra. It is also the rule that, if a vessel is injured or lost when being used in a manner or for a purpose different than that for which she was chartered, the charterer is liable, irrespective of his negligence. Latson v. Sturm, 14 Fed. Cas. 1187, No. 8,115 (D. C. E. D. N. Y.); Sutcliff v. Seligman, 121 Fed. 803, 58 C. C. A. 251 (C. C. A. 2d Cir.); Smith v. Bouker, supra; Beach v. Raritan & Del. Bay R. R. Co., 37 N. Y. 457; The Ely, 110 Fed. 563 (D. C. S. D. N. Y.), affirmed 122 Fed. 447, 58 C. C. A. 429.

[5] It then becomes necessary to determine whether there was any provision of the charter party in this case which imposed a greater liability upon the charterer than that imposed by the general rule of law before mentioned, and whether there was any limitation as to the purposes for which the tug could be used by the charterer, and, if so, whether, in rendering the salvage service, the charterer deviated from such purposes or uses. The charter party contains no covenant that the charterer shall deliver the vessel at the end of the term for which it was chartered in as good condition as when received, nor any express provision regarding liability for loss of or damage to the vessel. What the parties may have agreed upon subsequent to the time the salvage services were rendered, in respect to the charterers' liability, as is possibly evidenced by the Converse guaranty, is of no consequence. While there is implied in every charter, without being expressed, a covenant to deliver up the vessel at the end of the term, this does not, of course, affect the general rule of liability before stated. Charles Killam & Co. v. Monad Engineering Co., supra; Lake Michigan Car Ferry Transp. Co. v. Crosby, supra.

The charter party does provide, however, that the charterer shall pay for fire and marine insurance on the boat "covering towing from New York harbor to Edgemere and Rockaway Inlet," and, in the event of the inability to procure marine insurance "for towing on the outside to Edgemere, L. I.," that the charterer should give the owner "a bond to protect this company [the owner] in case of loss or damage to the boat *while on this work*." Hence, if there are any provisions of the charter party in question which enlarged the charterers' common-law liability, it must be found in the above-quoted parts which

deal with insurance and bond. I think they might be construed (especially in the light of the subsequent actions of the parties) to mean that, while the tug was engaged in the work which the insurance or bond was to cover, the charterers were to be liable for loss or damage to the vessel, irrespective of negligence, and that the insurance or the bond was to be in the nature of security to the owner in addition to the charterers' personal responsibility, doubtless because the latter was not considered sufficient. A bond ordinarily presupposes a primary liability of some kind on the part of the one furnishing it. In addition, on the day after the charter party was signed, the charterer, in writing the owner regarding his inability, before that time, to have procured the insurance or bond, said:

"In the meantime, should we make a trip to Edgemere, we will be entirely responsible to you to the amount of $8,000, in case of loss or damage to the boat while on this work."

This was a recognition of a greater liability on the charterers, in the event that the vessel went outside to Edgemere, than the general rules of law imposed. But certainly these provisions of the contract are not susceptible of a construction that the charterers' general liability was to be enlarged while the tug was engaged on work other than that which the insurance or bond was to cover, which was expressly limited to towing outside to Edgemere and Rockaway Inlet. Hence, unless it can be found that it was intended that the tug was to engage in *no other work than towing outside to Edgemere and Rockaway Inlet,* and that therefore the bond or insurance was to cover all work which it was intended the tug should do, it follows that while engaged in work in New York harbor (which she was doing when the salvage services were rendered) there was nothing in the contract to impose upon the charterers anything more than the common-law liability. Evidence was introduced (out of court) on behalf of the *owner* to the effect that it was understood, at the time the contract was signed, that the vessel was to engage only in towing to Edgemere and Rockaway Inlet. Notwithstanding that it was introduced on behalf of those who have succeeded to the owner's interest, and would, apparently, work to their disadvantage, I do not feel at liberty to consider it, both because I think that the evidence offered on behalf of the charterers—to the effect that there was no such limitation as to the use of the tug—when considered in connection with the subsequent acts of the parties, clearly outweighs it, and also because it was inadmissible, as it would vary the written contract, the latter in this respect being neither ambiguous nor apparently incomplete.

There is no express limitation in the contract as to the uses to which the tug could be put, nor can any be fairly implied; but, on the other hand, it seems entirely clear that it was intended that the tug could be used for any purpose for which such tugs are ordinarily used. If this is not so, why was the limitation in the clause dealing with the bond "to protect this company in case of loss or damage to the boat *while on this work*" (referring to towing on the outside to Edgemere, Long Island), inserted? The use of the words "while on this work" seems to demonstrate that it was contemplated that it would be engaged

on *other* work. In addition, on December 24th, the owner, in writing the charterers regarding the refusal of an insurance broker to write insurance covering towing to Edgemere, said:

"Therefore, in accordance with your agreement you will please obtain a bond *before you send this tug out of N. Y. Harbor to Edgemere, covering loss or damage to this tug in towing from New York to Edgemere, L. I.,* for the amount of eight thousand ($8,000) dollars."

The procuring of such insurance or furnishing of such a bond was (as appears from the subsequent letters of the parties, before referred to, and which crossed each other in the mails, and their actions) undoubtedly considered by parties a condition precedent to the right of the charterers to take the vessel outside of New York harbor. The charterers, however, took absolute possession of the vessel on the day succeeding the signing of the charter party and used it in towing in New York harbor to the knowledge of the owner, and without protest on its part, for, several days thereafter, although no insurance had been effected or bond procured. They did not, however, attempt to take it out of the harbor to Edgemere until after some insurance had been procured and a satisfactory guaranty to protect the owner against loss or damage had been obtained from a third party. The use to which the tug could be put was not therefore limited to towing to Edgemere and Rockaway Inlet.

It follows, also, as it was permissible, under the charter, for the charterers to use the tug inside of the harbor for any purposes for which vessels of that kind are ordinarily used, that in rendering the salvage services there was no deviation from the uses which the charter party permitted, because tugs are very frequently called upon to render salvage service, and it must be held that the parties contemplated such use. Nor, under such circumstances, could it be held that the act of rendering salvage services was, simply because they were in their nature dangerous and irrespective of the manner in which they were rendered, a failure to exercise the ordinary care which the law required of the charterers, so as to cast upon them all the risk of loss of or injury to the tug while engaged in the salvage operations. Such a holding would not only be at variance with what I have found was the contract of the parties in respect to the uses to which the tug could be put, and the measure of the charterers' duty when so using it, but would run counter to the settled policy of the law to encourage salvage. Hence, in the absence of negligence in the handling of the tug, all risk of loss of or damage to it, while rendering the salvage services, rested upon the owner. Under the rule which I have endeavored to formulate, as above, the owner is therefore entitled to some part of the salvage moneys, because of the risk which the rendition of the salvage services imposed upon it, and the charterers are entitled to some part because the earnings of the vessel belonged to them.

[6] 2. As it is not questioned that the members of the crew, with the exception of the captain, are entitled to participate in the fund, it is necessary to determine how the salvage moneys shall be apportioned between the charterers, the owner, and the crew. Considering that the cargo which was saved was of a very dangerous nature, consisting of

large caliber ammunition and high explosives, and the salvage operations therefore entailed considerable risk on the part of the crew, I have determined to allow as the "crew's share" one-third of the salvage money remaining after deducting the costs and expenses hereinafter mentioned. This is in accordance with the division made in The New Orleans, supra, The Richmond, supra, The Kaiser Wilhelm Der Grosse, supra, and The Scout, supra. It would be unjust, I think, to allow the owners a greater part of the salvage money than the value of the boat, when it is considered that the charterer was entitled to all of her earnings. Although the charter party is silent as to the amount of insurance or bond which the charterers, under the circumstances before mentioned, were to pay for or procure, as the case might be, it is entirely clear that the parties intended that it should be $8,000. This may be fairly considered as the sum which the owner considered that it would lose in the event that the vessel was totally destroyed. It was stipulated that in rendering the salvage services the vessel incurred the danger of being totally destroyed. The "owner's share," consisting of two-thirds, will accordingly be divided equally between the charterers and those who have succeeded to the interest of the actual owner. Such a division will not result in the latter receiving more than the value of the vessel, and will follow the division made by the Circuit Court of Appeals of the Second Circuit in The Arizonan, supra, and in The New Orleans, supra.

[7] 3. The next question is as to who is entitled to participate in the "crew's share," and in what proportions it shall be divided among them. It is contended by counsel for the owner that the captain should not receive any part of this share, because he had an interest in the earnings of the tug. I am unable, however, to agree with this contention. He risked his life, which the charterers did not, and for that reason I think should be compensated to the same extent and in the same way as though he were not to receive any part of the salvage moneys to be awarded to the charterers.

[8] One Andrew Brown, a friend of the captain, who was on board the tug at the time the salvage services were rendered, claims to be entitled to some part of the "crew's share." He admittedly performed no services whatever, nor was he called upon to do so; neither was he a member of the crew in any sense of the word. He took the trip at the invitation of the captain, presumably for recreation, as it was a holiday. I can find no justification in the evidence for the assertion of his counsel that he went on board at the request of the captain, to make up the number of the crew which the law required; there being a deficiency of one, owing to the absence of the mate that day. He was a painter by trade, was without any experience whatever on tug boats, or, for that matter, vessels of any kind. At best his position was that of a passenger, who contributed nothing towards the saving of the salved property. As such he is not entitled to share in the salvage moneys to be awarded to the crew. The Coriolanus, 6 Aspinall's Reports of Maritime Cases, 514. The authorities on which counsel for this claimant relies are not applicable, because they deal with members of a crew.

The mere fact that Mr. Brown states that he was willing to perform services, if he had been called upon to do so, does not overcome the

difficulty that is presented by the fact that he was neither a member of the crew nor a passenger who *actually did render* services. If, under these circumstances, he is entitled to share in the crew's award, it would follow, on principle, that every passenger on board vessels rendering salvage services, who would come into court and testify that he was willing to have performed services if he had been called upon to do so, would be likewise entitled to share in salvage awards. I am constrained to find, therefore, that Mr. Brown is not entitled to any part of the "crew's share" of the salvage moneys.

It is not clear from the evidence as to exactly who constituted the crew at the time in question, nor as to the wages which they were receiving, respectively. It has also been suggested in the case that some members of the crew have already assigned their shares of the salvage money. There will, therefore, be a reference to a commissioner to ascertain who were on board the tug as members of the crew when the salvage services were rendered, the amount of wages which they were respectively receiving, as also the amount of wages of which the captain was in receipt, and whether any of such members has validly assigned his share of the salvage moneys, and, if so, to whom the said share or shares are now due and payable. The "crew's share" will be divided among the captain and the members of the crew in proportion to their wages. If it should develop that the captain·was not in receipt of any fixed wages or salary, the commissioner will ascertain what sum was ordinarily paid, at the time in question, to persons occupying a similar position to that which he occupied and doing similar kind of work, and such sum will be, for the purposes of this case, considered as his wages.

[9] 4. As before stated, at the time the salvage services were rendered, the tug was owned by the Seaboard Equipment Corporation. About a month after the original libel was filed that company caused another libel to be filed to recover the salvage moneys to which it conceived that it was entitled as the owner of the tug. The two suits were subsequently consolidated, and the second libel ordered to be treated as a petition of intervention. Subsequently, but prior to the settlement which produced the fund now in court, the tug was sold to James Shewan & Sons, Incorporated, and, as part of the transaction, all of the Seaboard Equipment Corporation's salvage claims were assigned to the vendee. The second libel was filed by Mr. Axtell,,an attorney of the state of New York, through Mr. Rouse, a proctor of this court, pursuant to a written agreement between Axtell and the Seaboard Equipment Corporation whereby the former was retained to prosecute the latter's claims for salvage, and was to receive for his services 50 per cent. of any recovery which he might be able to effect. After the interest of the· Seaboard Equipment Corporation was transferred to the Shewan concern, the latter applied to be substituted as petitioner or libelant in the place of the former, and asked that proctors selected by it should be substituted for Mr. Rouse. Before this application came on to be heard, the settlement, which produced the fund now in court, was effected. Mr. Axtell, claiming to be entitled, by virtue of the contract before mentioned, to one-half of such part of the salvage moneys

as might be awarded to the Seaboard Equipment Corporation or its assignees, opposed the application unless his claim was fully protected. Thereupon, it appearing that the conflicting interests could be better passed upon at a final hearing, an order was made, by consent of all parties, constituting the Shewan petition a petition of intervention, and the reply which had been made by Mr. Axtell as a petition for a part of the fund.

It is not questioned that the Seaboard Equipment Corporation has parted with any claim or interest which it had in the fund now in court, and that the Shewan concern is entitled to the share of the moneys to which the former would have been entitled but for the assignment. The question on this phase of the case, therefore, is whether Mr. Axtell is entitled to any part of that share, and, if so, to what part or how much. It is claimed, on his behalf, that the contract by which he was retained constituted an equitable assignment of or imposed an equitable lien in his favor on one-half of any moneys which should thereafter accrue to the Seaboard Equipment Corporation on account of the salvage claim. On the other hand, it is urged on behalf of the Shewan concern that the retainer agreement did not have that effect, or, for that matter, create any lien, and that, if it did create a lien, it was only to the extent of the reasonable value of the services rendered by Mr. Axtell and Mr. Rouse up to the time the Shewan interest accrued and their consequent discharge as attorney and proctor, respectively. Shewan & Sons, however, consent that Mr. Axtell may be considered to have a lien, irrespective of how it arose, if in fact it has arisen, on the share which will go to it, to the extent of the reasonable value of the services rendered and disbursements made by him on behalf of the Seaboard Equipment Corporation.

It is settled in New York, where this contract was made, and by the law of which state, under the circumstances of this case, the rights of the parties under the contract are, I think, to be regulated (In re Paschal, 10 Wall. 483, 495, 19 L. Ed. 992), that even though an attorney has a contract, such as this, to conduct a case to an end for a certain part of any amount which he may recover, the client may discharge him at any time without cause, and in such case the attorney is entitled only to the reasonable value of the services rendered by him up to the time of the discharge (Martin v. Camp, 219 N. Y. 170, 114 N. E. 46; Roake v. Palmer, 119 App. Div. 64, 103 N. Y. Supp. 862; Johnson v. Ravitch, 113 App. Div. 810, 99 N. Y. Supp. 1059). The same rule prevails in federal courts sitting in New York. Ronald v. Mutual Reserve Fund Life Ass'n, 30 Fed. 228 (C. C. S. D. N. Y.); Silverman v. Penn. R. R. Co., 141 Fed. 382 (C. C. S. D. N. Y.); Du Bois v. City of New York, 134 Fed. 570, 69 C. C. A. 112 (C. C. A. 2d Cir.); Ibert v. Ætna Life Ins. Co., 213 Fed. 996 (D. C. E. D. N. Y.). The transfer of the interest of the Seaboard Equipment Corporation and the refusal of the assignee to continue the services of the original attorney was tantamount to his discharge by the former. Consequently Mr. Axtell cannot recover under the agreement more than the reasonable value of the services rendered by him

up to the time that Shewan & Sons acquired the interest of the Seaboard Equipment Corporation, together with the disbursements which he had theretofore made. Therefore, even if the agreement in question is sufficient in itself to constitute a lien upon the fund, it can be for no greater amount than the value of the services rendered, plus disbursements.

As Shewan & Sons consent that he may be considered to have a lien to that extent, it is unnecessary to consider whether or not the agreement does in fact entitle Axtell to an equitable lien, or whether, if it does not, the proctor of record has, irrespective of the provisions of the contract, a lien on the fund which came into existence after his discharge for the value of his services and disbursements. It remains only to consider what the services rendered by Mr. Axtell were reasonably worth. Practically no testimony has been taken on this point. I do not feel that the allowance should be based solely on the amount of labor performed (which was comparatively small), because I am reasonably well convinced, from the evidence, that, had Mr. Axtell not undertaken the assertion of the rights of the Seaboard Equipment Corporation, no effort would have been made by that concern to do so. This feature should therefore be taken into consideration in fixing his compensation, as also the compensation fixed by the contract (Nutt v. Knut, 200 U. S. 12, 21, 26 Sup. Ct. 216, 50 L. Ed. 348), as well as the amount recovered. In the latter connection, it must be borne in mind that there are other claims for salvage against the scow upon which the cargo which produced the fund now in court was loaded, and against another scow and its cargo, as yet undetermined, and which may result in Shewan & Sons receiving moneys in addition to those to be awarded to them out of the fund now in court.

The important work in this case was the establishment of the right to salvage moneys as against the cargo in question and in thereafter effecting the settlement. See In re Johnson Lighterage Company No. 24 (D. C.) 231 Fed. 365. Mr. Axtell took no part in these proceedings, nor, except in his own behalf, in the phase of the case dealing with the right of the owner of the vessel to some part of the salvage money. I think, upon the whole, that he will be amply compensated if he is allowed for his services $1,250, as well as all moneys which he has disbursed on account of the suit. This, however, will be in full for all services in connection with the libel originally filed at his direction, and also in full for the services of the proctor whom he employed to institute and prosecute the suit in this court.

5. Before any distribution of the fund whatever is made, there must be paid to the original libelant, as well as the proctor for the Seaboard Equipment Corporation, the costs and expenses incurred by them, respectively, in respect to the filing of the libel, the seizure of the cargo, marshal's and watchmen's fees incident thereto, and any other costs and fees incident to the prosecution of either libel and effecting the settlement with the owner of the cargo. All other costs and expenses incurred in establishing the claims of the respective parties to the fund in court must be borne by each party, respectively.

A decree may be entered in accordance with these conclusions.